**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MICHAEL GARCIA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BECKER PROFESSIONAL DEVELOPMENT CORPORATION,<br><br>Defendant. | Case No. 1:25-cv-12157-JEK<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BECKER PROFESSIONAL DEVELOPMENT CORPORATION'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........ 1

BACKGROUND ........ 2

I. Becker's Limited Contacts With Massachusetts........ 2

II. The VPPA and Plaintiff's VPPA Allegations........ 3

LEGAL STANDARD........ 5

ARGUMENT........ 6

I. The Court Lacks Personal Jurisdiction Over Becker. ........ 6

A. Becker Is Not Subject to General Jurisdiction in Massachusetts. ........ 6

B. Becker Is Not Subject to Specific Jurisdiction in Massachusetts. ........ 7

II. Plaintiff Has Failed To State a Claim Under the VPPA Because He Has Not Alleged That Becker Disclosed PII........ 14

A. Plaintiff Has Not Alleged That the Title of a Specific Video Was Disclosed. ........ 15

B. Plaintiff Has Not Alleged That the Information Was Disclosed That Would Identify Him. ........ 17

CONCLUSION........ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)......6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)......6

*Chase v. Gist*,
2012 WL 1581682 (D. Mass. May 3, 2012)......11

*Connoisseurs Prods. Corp. v. Fresh Finest, LLC*,
2025 WL 786660 (D. Mass. Mar. 12, 2025)......10

*Cossaboon v. Maine Med. Ctr.*,
600 F.3d 25 (1st Cir. 2010)......9

*Egan v. X-Mode Social Inc.*,
2024 WL 2701967 (D. Mass. May 24, 2024)......10

*Frawley v. Nexstar Media Grp., Inc.*,
2023 WL 6065768 (D. Mass. Sept. 18, 2023)...... *passim*

*Garagesocial, Inc. v. Hagerty Grp., LLC*,
2025 WL 1676511 (D. Mass. June 13, 2025)......12, 13

*Ghanaat v. Numerade Labs, Inc.*,
689 F.Supp.3d 714 (N.D. Cal. 2023)......20

*Harlow v. Children's Hosp.*,
432 F.3d 50 (1st Cir. 2005)......9

*Heerde v. Learfield Communications, LLC*,
741 F.Supp.3d 849 (C.D. Cal. 2024)......19

*Hughes v. Nat'l Football League*,
2025 WL 1720295 (2d Cir. June 20, 2025)......15

*Hussain v. Rhode Island Hosp.*,
2019 WL 3546888 (D. Mass. June 12, 2019)......13

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945)......1

*Krua v. Sirleaf*,
2019 WL 1936733 (D. Mass. May 1, 2019)....................13

*Kuan Chen v. United States Sports Acad., Inc.*,
956 F. 3d 45 (1st Cir. 2020)....................6, 7, 8, 10

*Lionetta v. InMarket Media, LLC*.
2025 WL 2533787 (D. Mass. Sept. 3, 2025)....................9

*Louth v. NFL Enters. LLC*,
2022 WL 4130866 (D.R.I. Sept. 12, 2022)....................19

*A.G. ex. rel. Maddox v. Elsevier, Inc.*,
732 F.3d 77 (1st Cir. 2013)....................6

*Mass Schl. of L. at Andover, Inc. v. Am. Bar Ass'n*,
142 F.3d 26 (1st Cir. 1998)....................10

*Motus, LLC v. CarData Consultants Inc.*,
520 F.Supp. 3d 87 (D. Mass. 2021)....................5, 6, 7, 9

*Newman v. Eur. Aeronautic Defence & Space Co. Eads N.V.*,
700 F.Supp.2d 156 (D. Mass. 2010)....................9

*Pettengill v. Curtis*,
584 F.Supp.2d 348 (D. Mass. 2008)....................13

*Plixer Int'l, Inc. v. Scrutinizer GmbH*,
905 F.3d 1 (1st Cir. 2018)....................7, 8

*Rancourt v. Meredith Corp.*,
2024 WL 381344 (D. Mass. Feb. 1, 2024)....................16, 19

*Restuccia v. H&R Block Tax Servs. LLC*,
2021 WL 4658734 (D. Mass. Oct. 7, 2021)....................13

*SCVNGR, Inc. v. Punchh, Inc.*,
2018 WL 6492729 (Mass. Super. Sept. 17, 2018)....................13

*Solomon v. Flipps Media, Inc.*,
136 F.4th 41 (2d Cir. 2025)....................15

*Taino v. Bow Tie Cinemas, LLC*,
2025 WL 2652730 (S.D.N.Y. Sept. 16, 2025)....................16

*Tassinari v. Salvation Army Nat'l Corp.*,
610 F.Supp.3d 343 (D. Mass. 2022)....................18

*Therrien v. Hearst*,
2025 WL 1208535 (D. Mass. April 25, 2025) ..... 19

*Tobias v. Smith*,
2022 WL 1129376 (D. Mass. Apr. 15, 2022) ..... 5

*Yershov v. Gannett Satellite Info. Network, Inc.*,
820 F.3d 482 (1st Cir. 2016) ..... 14, 16, 18, 19

**Statutes**

18 United States Code
§ 2710 ..... *passim*
§ 2710(a)(3) ..... 14

18 United States Code
§ 2710(b)(1) ..... 14

Mass. Gen. Laws Annotated Chapter 223A, § 3 ..... 6, 10

**Rules and Regulations**

Federal Rule of Civil Procedure 12(b)(2) ..... 5

Federal Rule of Civil Procedure 12(b)(6) ..... 5, 14

**Other Authorities**

134 Cong. Rec. S5397-01, 1988 WL 170802 (May 10, 1988) ..... 3, 15

Google, How Google Uses Cookies,
https://policies.google.com/technologies/cookies?hl=en-GB (last visited Oct. 1, 2025) ..... 18

Massachusetts Long Arm Statute
§ 3(a) ..... 11
§ 3(c) ..... 11, 12, 13
§ 3(d) ..... 11, 13

S. Rep. No. 100-59 (1988) ..... 3

U.S. Const. amend. XIV § 1.3 ..... 1, 7, 10

## INTRODUCTION

This lawsuit is an attempt by counsel for Plaintiff Michael Garcia ("Plaintiff") to forum-shop for a court they perceive as receptive to this putative class action under the Video Privacy Protection Act ("VPPA"). However, this court lacks personal jurisdiction over Defendant Becker Professional Corporation ("Becker"). Becker is not "at home" in Massachusetts, it does not have an office here, does not operate out of Massachusetts, and does not offer Massachusetts-specific content on its website, www.becker.com (the "Website"). Nor is there any connection between Becker's alleged conduct and Massachusetts; Plaintiff's sole asserted tie is his own residency, which is plainly insufficient to subject Becker to suit here. Forcing Becker to defend itself here would contravene the Due Process Clause of the Constitution and "offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

Even if this Court were to determine that there is personal jurisdiction over Becker, the Court should still dismiss Plaintiff's claim. Plaintiff has failed to state a viable claim under the VPPA, stretching a law that prohibits the disclosure of one's video viewing history beyond recognizable bounds. Plaintiff's Complaint is long on technical jargon and footnotes about cookies and browser IDs, but short on the specific, plausible allegations the VPPA requires. Nowhere does Plaintiff allege facts showing that Becker disclosed information that could reasonably and foreseeably identify him—as an individual, rather than merely his device or browser—or link him to the viewing of a particular video. The Complaint's reliance on generic references to tracking technologies falls far short of the statute's requirement that the disclosure actually identify *both* a person and the specific video content viewed. This Court should reject Plaintiff's attempt to stretch the VPPA beyond its limits and dismiss the Complaint.

## BACKGROUND

### I. Becker's Limited Contacts With Massachusetts

Becker is provider of web-hosted exam review courses and continuing professional education for accounting professionals, incorporated under the laws of Delaware with its headquarters in Missouri. (Brown Decl. ¶ 3 ("Decl.")). Becker owns no real estate here, and maintains no offices here. (*Id*. ¶ 5.) Only four of the 171 individuals who provide dedicated services to Becker happen to reside in Massachusetts. (*Id*. ¶ 6.) None of those employees oversee what data is collected by the Website. (*Id*.)

Becker's Website is accessible to anyone with an internet connection, and users of the Website must sign up and pay to access course materials beyond an optional initial free trial period. (*Id.* ¶ 8.) Based on the shipping and billing addresses provided with payment methods for course materials, Becker is able to apportion its total revenue on a state by state basis. (*Id.* ¶ 7.) In 2024, only 2.1% of Becker's overall revenue came from Massachusetts. (*Id.*)

In 2023, only 666 users purchased course materials from Becker and provided a billing or shipping address in Massachusetts, making up only 2.4% of the total number of users who did so in 2023. In 2024, that number was 734, or 2.5%. And as of August 2025, that number was 588, or 2.6%. (*Id*. ¶ 10.)

Becker does not target Massachusetts residents in offering its services. For example, the course materials Becker offers for the Certified Public Accountant or "CPA" exam do not contain state-specific information; instead, they are designed for a national audience. (*Id.* ¶ 13.) Further, though Becker offers continuing professional education ("CPE") course materials that provide credits that meet the requirements for multiple states, Becker does not provide Massachusetts-specific CPE content. (*Id.* ¶ 14.) Becker similarly does not offer Massachusetts-

specific content for users pursuing other courses on its Website. (*Id.* ¶ 15.) Likewise, Becker does not target Massachusetts for general advertising or marketing purposes. (*Id.* ¶¶ 11.)

## II. The VPPA and Plaintiff's VPPA Allegations

The VPPA, passed in 1988 in response to a newspaper's publication of then-Supreme Court nominee Robert Bork's video rentals, prohibits video tape service providers from knowingly disclosing personally identifiable information ("PII"), defined as information that identifies a consumer as having requested or obtained specific video materials. Thus, a violative disclosure must contain *both* information that identifies a person and information that identifies the specific video materials that person requested or obtained, *i.e.*, the *titles* of the videos. *See* S. Rep. No. 100-59 (1988) (describing list of movies Bork rented, the publication of which spurred the VPPA, noting the bill "prohibits video stores from disclosing 'personally identifiable information' - information that links the customer or patron to particular materials or services"); 134 Cong. Rec. S5397-01, 1988 WL 170802 (May 10, 1988) (video stores can sell customer lists, but "cannot disclose the *particular* films their customers have rented.") (emphasis added).

Plaintiff alleges that Becker unlawfully disclosed users' personally identifiable information ("PII"), including their specific video viewing data, to third parties, specifically Google and Meta, through the use of website tracking technologies. Plaintiff alleges that when a user watches a video on Becker's website, certain information is transmitted—purportedly video titles, URLS, and user identifiers—to Google and Meta via tools such as Google Analytics and the Meta Pixel. Plaintiff claims this alleged transmission constitutes a violation of the VPPA.

However, despite the Complaint's lengthy footnotes, Plaintiff's allegations are notably generic and lack critical specifics. Though Plaintiff alleges that he created a Becker account and watched pre-recorded videos on the Becker Website (Compl. ¶ 66), Plaintiff does not identify

any particular video that he himself viewed or whose title or viewing information was disclosed. Instead, he cites a single example of a video allegedly disclosed to third parties (*id.* ¶¶ 19, 20, 31, 32), but he does not allege that he watched that video or any specific video at all. With respect to Google, Plaintiff does not allege that he has a Google account, that he was signed into such an account, or that he enabled Ads Personalization—facts necessary for Google to associate any purported disclosure with his identity, according to Plaintiff's own allegations. (*Id.* ¶¶ 22, 70, 49-52.) He also alleges various "cookies" are transmitted that allow Google to remember users' activities when logged into a Google account, but again, he does not allege to have one. (*Id.* ¶¶ 23, 70.) Similarly, Plaintiff does not allege that any information previously provided to Google could be matched to him via the "AUID" identifier, as necessary to identify him.

Moreover, with respect to Meta, Plaintiff alleges that Becker's website transmits hashed phone numbers and browser IDs, but does not allege that he has a Facebook account, that he was logged into such an account while viewing any video, that his Facebook account ID was disclosed, or that Meta could use any of the transmitted information to identify him as having watched a specific video. (*E.g.*, *id.* ¶ 70.) The Complaint also fails to allege that Meta will likely identify him from the hashed phone number or browser ID, or that Meta would connect any video viewing activity to his identity.

With respect to the alleged disclosure of video titles, Plaintiff's own allegations cast doubt on whether the information transmitted to Google or Meta actually constitutes the title of any video he viewed. For Google, Plaintiff points to a field in the website's code labeled "dt," which he claims contains the video title (*id.* ¶¶ 19, 20), but provides no explanation or factual support for why this field should be understood as the actual title of a video, as opposed to some other page feature or metadata. For Meta, Plaintiff similarly references a field called "cd[page

features],” asserting that it contains the video title, even though this field contains a different “title” for the same video (*id*. ¶¶ 31, 32). Again, Plaintiff does not sufficiently allege that this field truly reflects the title of a video watched by the user or merely some other descriptive element of the webpage. Plaintiff offers no allegations or technical explanation to bridge this gap, leaving it entirely speculative whether the information allegedly disclosed to Google or Meta is, in fact, the title of any video he watched.

## LEGAL STANDARD

On a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), the plaintiff bears the burden of proving jurisdiction exists. Under the prima facie standard, where the court “is called to” decide the motion “without first holding an evidentiary hearing,” the plaintiff cannot merely rely on “unsupported allegations” in a complaint. *Tobias v. Smith*, 2022 WL 1129376, at *2 (D. Mass. Apr. 15, 2022). Instead, the plaintiff “must put forward evidence of specific facts to demonstrate jurisdiction exists.” *Id*. (internal citation omitted). In federal question cases such as this one, when “the federal statute is silent on the availability of nationwide service of process,” as the VPPA is, “and nothing in the record indicates that defendant is excluded from the jurisdictional reach of every state,” the plaintiff must satisfy the forum state’s long-arm statute. *Motus, LLC v. CarData Consultants Inc.,* 520 F.Supp. 3d 87, 90–91 (D. Mass. 2021), *aff’d*, 23 F.4th 115 (1st Cir. 2022). Therefore, “this Court must conduct the same personal jurisdiction inquiry as in a diversity case, focusing on [Becker’s] contacts with Massachusetts rather than with the United States as a whole.” *Id*. at 91.

Under Rule 12(b)(6), a complaint must “contain sufficient factual matter, accepted as true, to ‘state a claim to relief that is plausible on its face.’ A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 570 (2007)). To survive a motion to dismiss for failure to state a claim, the plaintiff must show "more than a sheer possibility" of liability. *A.G. ex. rel. Maddox v. Elsevier, Inc.,* 732 F.3d 77, 80 (1st Cir. 2013) (citation omitted).

## ARGUMENT

### I. The Court Lacks Personal Jurisdiction Over Becker.

Plaintiff cannot meet his burden of demonstrating this Court has personal jurisdiction over Becker because Becker is subject to neither general jurisdiction in Massachusetts, nor to specific jurisdiction under the Massachusetts' long-arm statute. Mass. Gen. Laws Ann. ch. 223A, § 3 ("Long-Arm Statute"); *Frawley v. Nexstar Media Grp., Inc*., 2023 WL 6065768, at *4–5 (D. Mass. Sept. 18, 2023). Plaintiff similarly cannot show that the Court's exercise of jurisdiction over Becker would comport with the requirements of Due Process. *Motus*, 520 F.Supp.3d at 90.

#### A. Becker Is Not Subject to General Jurisdiction in Massachusetts.

Becker is not subject to general jurisdiction in Massachusetts because it is not at "home" here. A corporation is considered "at home" in "its state of incorporation and the state that houses its principal place of business." *Frawley*, 2023 WL 6065768 at *4, n.1 (citation omitted). Becker is headquartered in St. Louis, Missouri, incorporated in Delaware, and has no operations in Massachusetts; its general business operations in Massachusetts are not "so unusually substantial" and "sufficiently continuous and systematic 'as to render [it] essentially at home'" here. *Kuan Chen v. United States Sports Acad., Inc.*, 956 F.3d 45, 57 (1st Cir. 2020). "[T]he mere whiff of a virtual presence" is not enough. *Id.*, 956 F.3d at 57-58.

**B. Becker Is Not Subject to Specific Jurisdiction in Massachusetts.**

Plaintiff must establish that specific jurisdiction 1) coheres with the Due Process Clause of the Fourteenth Amendment and 2) is permitted by the forum's long-arm statute. *Motus, LLC*, 520 F.Supp.3d at 91. Plaintiff fails on both fronts.

**1. Exercising Personal Jurisdiction Here Would Violate Due Process.**

"[T]he Due Process Clause imposes three requirements for exercising specific jurisdiction over out-of-forum defendants." *Chen*, 956 F.3d at 59. First, "the Plaintiff's claim must directly arise from or relate to the defendant's activities in the forum." *Id*. Second, "the defendant's forum-state contacts must 'represent a purposeful availment of the privilege of conducting activities in that state.'" *Id*. Third, "the exercise of specific jurisdiction in the forum must be reasonable under the circumstances." *Id.* "Failure to make any one of these showings" is fatal to specific personal jurisdiction. *Id*.

**a. No purposeful availment.**

"When, as here, the contacts in question are related to a website that is available in the forum but that is operated outside of it, the Court's focus should begin with the purposeful availment prong." *Frawley*, 2023 WL 6065768, at *5. To demonstrate purposeful availment, the court considers "voluntariness" and "foreseeability"—meaning "the contacts must be voluntary rather than the result of unilateral actions of another party" and they must also be sufficient to give the defendant notice '"such that [it] could 'reasonably anticipate being haled into court' involuntarily in the Commonwealth." *Id*. (citations omitted). Plaintiff cannot satisfy either voluntariness or foreseeability based solely on allegations that a website is available to Massachusetts residents. *Plixer Int'l, Inc. v. Scrutinizer GmbH*, 905 F.3d 1, 8 (1st Cir. 2018) (describing "baseline principle" that "a website operator does not necessarily purposefully avail

itself of the benefits and protections of every state in which its website is accessible.”). Plaintiff must point to “something more” for purposeful availment, *id*., and Plaintiff here summarily claims that Becker “purposefully avails itself of the benefits of this District by selling subscriptions to persons whom Defendant knows to reside in this District (based on billing information provided to Defendant at checkout).” (Compl. ¶ 76.)

The First Circuit’s decision in *Chen v. United States Sports Acad., Inc.*, is instructive here. There, the plaintiff argued that because the defendant, USSA, “solicit[ed] Massachusetts-based students online through its informational website and maintain[ed] an interactive online learning platform, accessible in Massachusetts,” the court could exercise personal jurisdiction over USSA. 956 F.3d at 59. The plaintiff also pointed to the fact that the USSA received tuition from plaintiff—and plaintiff was in Massachusetts—and that plaintiff received email communications from USSA in Massachusetts. *Id*.

The First Circuit rejected these arguments, holding that the plaintiff had not shown the USSA had “purposefully availed” itself of doing business in Massachusetts, even though the defendant solicited Massachusetts-based students through its website, operated an online education platform available nationwide (including Massachusetts), and obtained tuition from the Massachusetts plaintiff. *Chen*, 956 F.3d at 61. Regarding voluntariness, the Court found that USSA “[n]either aims its informational website specifically at prospective students in Massachusetts [n]or derives significant revenue from Massachusetts-based individuals through its maintenance of this web-site.” *Id*. at 60. Regarding foreseeability, the Court noted that while USSA could have anticipated Massachusetts residents to enroll in its program, that was a “broad and generic degree of foreseeability” that was “insufficient” for purposeful availment. *Id*.

Here, for the same reasons, Plaintiff similarly does not and cannot allege that there was any specific targeting of Massachusetts by Becker. Any case-specific contacts with Massachusetts are from Plaintiff Garcia's *own* activity—but not *Becker's* activities in the state. Becker clearly does not aim its website at Massachusetts, as for the past two years, less than 3% of nationwide users who purchased its course materials were from Massachusetts. Further, only 2.1% of Becker's overall revenue was from Massachusetts in 2024—hardly "substantial" under the applicable analysis.[1] And Becker does not offer any content specific to Massachusetts users.

The facts here also stand in contrast to those of *Lionetta v. InMarket Media, LLC*. 2025 WL 2533787, at *1 (D. Mass. Sept. 3, 2025), where this Court held that jurisdiction was proper. There, the plaintiff alleged that the defendant selected what ads were displayed through its affiliate applications and allowed advertisers to send push notifications based on a consumer's location, which was available because defendant had embedded its software in third-party applications "knowing [ ] it would obtain geolocation data from consumers in Massachusetts." *Id*. at **4-5. Here, however, Becker does not engage in such specific advertising (Decl. ¶¶ 11) and Plaintiff has not alleged that Becker's Website even collects or discloses geolocation data (*e.g.* Compl. ¶ 17). The only "contact" is the passive accessibility of the site by anyone, anywhere. Therefore, there is no purposeful availment.

**b. No Relatedness.**

The relatedness prong requires a "'demonstrable nexus' between the claims of the plaintiff and the defendant's contacts in the forum state." *Motus*, LLC, 520 F.Supp.3d 91

[1] *See Cossaboon v. Maine Med. Ctr.,* 600 F.3d 25, 31 (1st Cir. 2010) (3.24% of total revenue not "substantial"); *Harlow v. Children's Hosp.*, 432 F.3d 50, 66 (1st Cir. 2005) (revenue of $2 million or 0.5% of the defendant's revenue not substantial); *Newman v. Eur. Aeronautic Defence & Space Co. Eads N.V.*, 700 F.Supp.2d 156, 168 (D. Mass. 2010) (1.36% not substantial).

(internal citation omitted). Plaintiff once again summarily claims that "[Becker's] conduct giving rise to this action arises out of and relates to [its] business," but this is not enough. Plaintiff does not plead that the alleged violation—Becker's purported disclosure of data to Facebook and Google through codes on the Website—is tied to any act or omission *in Massachusetts*, and thus the claim is not related to the Commonwealth. *See Egan v. X-Mode Social Inc.*, 2024 WL 2701967 (D. Mass. May 24, 2024) (though the initial collection of geolocation data through defendant's app was in Massachusetts, that was not enough to make the claim—the sale of that geolocation data—related to Massachusetts). Nor is it plausible that the allegedly violating disclosure would be related to Massachusetts—indeed, the VPPA claim here does not arise out of any of geolocation-specific activities.

**c. No Reasonableness.**

Finally, the exercise of jurisdiction must be reasonable under the circumstances. *Chen*, 956 F.3d at 59. Litigating in a Massachusetts forum imposes a burden on Becker, which does not have employees in this state who can actually testify about the claims at issue in this matter. While Massachusetts may have an interest in protecting the rights of its citizens, this case does not raise any novel issues that would impact Massachusetts law—rather, Plaintiff's Complaint is based exclusively on a federal statute. Simply put, Massachusetts has no special stake in this case, and Becker reasonably expects not to be haled into court in Massachusetts. In short, the exercise of jurisdiction here over Becker does not comport with due process. For this reason alone, the Court should dismiss for lack of personal jurisdiction.

**2. Plaintiff Cannot Satisfy the Massachusetts Long-Arm Statute.**

Even if Plaintiff could satisfy the Due Process Clause—which he cannot—Plaintiff also cannot satisfy the Massachusetts Long-Arm Statute. A claim must arise from Massachusetts-

based activities alleged to satisfy the Long-Arm Statute. *Connoisseurs Prods. Corp. v. Fresh Finest, LLC*, 2025 WL 786660, at *5 (D. Mass. Mar. 12, 2025); *see, e.g., Mass Schl. of L. at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 34 (1st Cir. 1998) (exercise of specific jurisdiction is limited to when there is a "demonstrable nexus between a Plaintiff's claims and a defendant's forum based activities"). Here, Plaintiff summarily claims that Becker "collected and disseminated the personally identifiable information and video-viewing information giving rise to this lawsuit in this District." (Compl. ¶ 76). Yet this is not enough to demonstrate personal jurisdiction under any of the potentially-applicable prongs of the Long-Arm Statute. The only potential hooks here are Section 3(a) (claims arising from "transacting any business in this commonwealth") or Section 3(c) (claims arising from "causing tortious injury by an act or omission in this commonwealth"), but neither applies. And Section 3(d) of the Long-Arm Statute is unavailable because this Court lacks general jurisdiction over Becker.

**a. Plaintiff's claims do not arise from Becker's transaction of business in Massachusetts.**

For jurisdiction to exist under Section 3(a) of the Long-Arm Statute, Plaintiff must show that Becker transacted business in Massachusetts *and* Plaintiff's claim arose from the transaction. *Frawley*, 2023 WL 6065768 at *4. Thus, the only activities that could satisfy the requirements of Section 3(a) are those related to Plaintiff's interaction with videos on the Website, as that is the mechanism through which the alleged illegal disclosure occurred.

The mere fact that Becker offers a website accessible in Massachusetts is "insufficient, without more, to constitute 'transacting business'" within the meaning of the statute. *Frawley*, 2023 WL 6065768 at *4 (citing *Chase v. Gist*, 2012 WL 1581682 at *3 (D. Mass. May 3, 2012)). And even assuming that any of Becker's activities through its Website have any effect on the

commerce of the Commonwealth at all, such effects are minimal. Contacts with Massachusetts that only have a "slight effect" on commerce within the state do not fall within the statute. *Id*.

*Frawley,* another Pixel-based VPPA case, is instructive. There, the court found that Section 3(a) did not apply because the defendant's contacts in Massachusetts were "not related to the controversy" and "played no role in the 'train of events' that resulted in the alleged injury" (the alleged disclosure of the plaintiff's personal viewing history). *Id*. at *4 (internal citation omitted). The plaintiff argued that the media defendant's website solicited consumers in Massachusetts to sign up for its digital and print newspaper and "that the injury he suffered occurred in the Commonwealth." *Id*. But the plaintiff did not make any assertion that the defendant "actively solicited Massachusetts citizens more than citizens of any other state." *Id*. The court therefore ultimately noted that "[t]he defendant's only relevant presence in Massachusetts here is the availability of the website . . . which is insufficient, without more, to constitute 'transacting business.'" *Id*. (quoting *Chase*, 2012 WL 1581682 at *3).

Plaintiff's claims here should similarly fail. Plaintiff does not (and cannot) allege that Becker has taken any action to target Massachusetts residents, to advertise generally in the Commonwealth, or to solicit signups in Massachusetts more so than any other state. (*See* Compl. ¶ 12.) Nor can Plaintiff allege that Becker's course materials have more than a "slight effect" on the commerce of Massachusetts, given that they are not tailored for Massachusetts specifically. (Decl. ¶¶ 12, 14-15.) Like the entities in *Frawley*, here, Defendant's only relevant presence in Massachusetts is the operation of its website; without more, that is insufficient.

**b. Becker has not caused "tortious injury by an act or omission in" Massachusetts.**

Plaintiff have similarly failed to establish jurisdiction under Section 3(c) of the Long-Arm Statute. They cannot establish that their "action arises from [Becker] causing tortious injury

by an act or omission in Massachusetts." *Garagesocial, Inc. v. Hagerty Grp., LLC*, 2025 WL 1676511, at *4 (D. Mass. June 13, 2025) (quotation omitted). Ultimately, "Section 3(c) 'is intended to apply only when the act [or omission] *causing* the injury *occurs within the Commonwealth*.'" *Id*. (emphasis added). Notably, "the fact that [ ] 'harm' is felt by [a plaintiff] in Massachusetts does not mean that infringement occurred here." *Id*. (citation omitted).

Plaintiff alleges generally that Plaintiff is a resident and citizen of Massachusetts, (Compl. ¶¶ 66, 72), and summarily claims that because Becker collected and disseminated the personally identifiable information and video-viewing information giving rise to this lawsuit in this District, jurisdiction is proper here. (*Id*. ¶ 76.) However, the action at issue is the purported disclosure of information in violation of VPPA, and it is not at all plausible that Becker disclosed this information to Google and Meta *in Massachusetts*, given that none of Becker's website operations are based in Massachusetts (Decl. ¶ 5), and there is no allegation that Meta or Google's operations are based in Massachusetts either. *See, e.g., Hussain v. Rhode Island Hosp*., 2019 WL 3546888, at *4 (D. Mass. June 12, 2019) ("Section § 3(c) is inapplicable because there are no facts which demonstrate that defendants took any action in Massachusetts."); *SCVNGR, Inc. v. Punchh, Inc*., 2018 WL 6492729, at *4 (Mass. Super. Sept. 17, 2018) (Section 3(c) "bases jurisdiction on where the tortious act was undertaken, not where its effect was felt, even when the defendant knew that the plaintiff was located in Massachusetts").

**c. Becker neither caused tortious injury nor regularly does or solicits business in Massachusetts.**

Plaintiff similarly cannot rely on Section 3(d) of the Long-Arm Statute, which applies "only if general jurisdiction exists" over the defendant. *Pettengill v. Curtis*, 584 F.Supp.2d 348, 357 (D. Mass. 2008). *See also Frawley*, 2023 WL 6065768, at *4 ("the Court can only rely on

Section 3(d) when it has general jurisdiction over the defendants").[2] As noted above in *supra* section IA, general jurisdiction does not exist here because Becker is not "at home" in Massachusetts. *E.g. Frawley*, 2023 WL 6065768, at *4.

## II. Plaintiff Has Failed To State a Claim Under the VPPA Because He Has Not Alleged That Becker Disclosed PII.

Even if this Court were to find personal jurisdiction, the Complaint should nonetheless be dismissed under Rule 12(b)(6). The VPPA is not a catch-all privacy statute; Congress imposed exacting requirements for a violation when it passed it in 1988 and Plaintiff has not met them. To state a claim, Plaintiff must plausibly allege that Becker "knowingly" disclosed his personally identifiable information ("PII") to a third party. 18 U.S.C. § 2710(b)(1). PII "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *Id.* at § 2710(a)(3). In the First Circuit, PII comprises "information reasonably and foreseeably likely to reveal which … videos [a person] has obtained." *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016). This does not encompass every disclosure of code, as the recipient must be foreseeably likely to connect an individual and a specific video requested or obtained. The information ceases to be PII at a point "at which the linkage of information to identity becomes too uncertain, or too dependent on too much yet-to-be-done, or unforeseeable detective work." *Id*.

The generic example Plaintiff provides of the disclosure of information relies heavily on this "yet-to-be done" work. Plaintiff fails to properly allege that the title of a specific video was revealed to Meta or Google. As for information identifying a person, the Complaint is long on footnotes and irrelevant cites, but short on what is actually disclosed to third parties about

[2] *See also Restuccia v. H&R Block Tax Servs. LLC*, 2021 WL 4658734, at *5 (D. Mass. Oct. 7, 2021) (same); *Krua v. Sirleaf*, 2019 WL 1936733, at *4 (D. Mass. May 1, 2019) (same).

Plaintiff that would allow them to identify *him*, not just his device. For Google, there are no allegations that the Plaintiff has a Google account or turned on Ad Personalization such that the "cookies" were disclosed as alleged, and further, those cookies do not allow Google to identify a person; for Meta, the allegations that a hashed phone number and a browser value (unconnected to any Facebook account) are also not enough for Facebook to identify a person.[3]

**A. Plaintiff Has Not Alleged That the Title of a Specific Video Was Disclosed.**

Plaintiff has not pled that any disclosures to Meta and Google would reveal to them the *specific* audiovisual material selected by Plaintiff. The VPPA was enacted to prevent the disclosure of a person's private video choices, in circumstances where the disclosure would easily identify the specific title of the video. *See* 1988 WL 170802 (May 10, 1988) ("[W]hat the law should not allow, is that a detailed list of their previous rentals - the titles of the films, the dates they were rented - will be disclosed to other[s]. . . .").

Plaintiff points to one video as an example of the alleged VPPA violation, yet he does not allege that he viewed that video or any specific video on Becker's website. He alleges that the title of the video disclosed to Google in his generic example is "Conflict Resolution | CPE Learning" and that the title is indicated a line in the code labeled "dt." (Compl. ¶¶ 19, 20.) For the alleged Meta disclosure, however, he claims that the same video is titled simply "Conflict

[3] Despite Plaintiff's repeated allegations that an ordinary person could decipher this information to identify a person and the video he or she watched, Plaintiff's claims plainly would not survive under the Second Circuit's "ordinary person" standard. In *Solomon v. Flipps Media, Inc.*, 136 F.4th 41 (2d Cir. 2025), the Second Circuit held that an ordinary person could not decipher the identify of a user, even when a Facebook ID connected to a Facebook account was disclosed. Multiple decisions following *Solomon* hold the same. *E.g., Hughes v. Nat'l Football League*, 2025 WL 1720295, at *2-3 (2d Cir. June 20, 2025) (summary order) (stating *Solomon* "effectively shut the door for Pixel-based VPPA claims," regardless of how Facebook might later manipulate or use the code). Here, there are even fewer identifying allegations—Plaintiff does not allege the existence of a Facebook account or that their Facebook ID was disclosed—just that a hashed phone number and a cookie that identifies a browser was disclosed.

Resolution," which is shared via a line of code called "cd[page features]" (Compl. ¶¶ 31, 32), but he offers no explanation for why the titles differ.

To start, it's not even clear how Plaintiff purportedly determined what the title of the video on the cited page is—the code does not indicate the cited title is the title of a video, as opposed to any other page feature, such as page title. Moreover, even assuming Plaintiff has plausibly pled the correct title of video (questionable given the incongruity of the title in the alleged disclosure to Meta versus Google), Plaintiff does not allege how one would connect the alleged title with the actual video on the Website. In *Rancourt v. Meredith Corp.*, the plaintiff alleged that a Google search including the video ID would reveal the specific video watched. 2024 WL 381344 at *2 (D. Mass. Feb. 1, 2024). Here, there is no such connecting allegation.

More critically, Plaintiff does not allege that Meta or Google understand that "Conflict Resolution | CPE Learning" or "Conflict Resolution" is the title of the video on the article page, as opposed to a reference to any other feature on the page. There is no allegation, for example, that Facebook interprets the one line of code prefaced by "cd[pageFeatures]:" to reference the title of a video on the page or even that Becker programmed that coding to reference videos. These failures are significant because under this Circuit's binding precedent in *Yershov*, for a disclosure to contain PII, it must reveal which videos a person has obtained. 820 F.3d at 486. Revealing what *page* was visited is not enough. Here, Plaintiff has not alleged that this line of code reveals to Google and Meta specifically what videos a user watched.[4]

[4] Plaintiff's allegation that an "ordinary person" could decipher the title of the video from the code (*e.g*. Compl. ¶ 34)—if that is even the video title—is highly implausible. For example, in *Taino v. Bow Tie Cinemas, LLC*, 2025 WL 2652730, at *8 (S.D.N.Y. Sept. 16, 2025), the court applied the "ordinary person" standard and observed that, although the code included the phrase "Venom-Let-There-Be-Carnage-Trailer-and-Info&rl," which plaintiff highlighted with red boxes to show it contained the movie's name, "it is implausible that an ordinary person would be able

### B. Plaintiff Has Not Alleged That the Information Was Disclosed That Would Identify Him.

#### 1. *The Alleged Disclosure to Google*

Plaintiffs' VPPA claim fails for the independent reason that Plaintiff has not alleged that Google or Facebook received information that would likely or foreseeably identify *him*.

Plaintiff alleges that the Google tracking technologies are activated when "a user accesses the Becker Website while logged in to a Google account." (Compl. ¶ 23.) These tracking technologies "compel that user's browser to transmit several Google cookies." (*Id.*) For example, Plaintiff alleges that Defendant has enabled Google Signals, which he alleges associates data with user's Google accounts. Plaintiff further alleges that this technology only does so for those who have *both* signed into a Google account and turned on Ads Personalization. (*Id*. ¶¶ 22, 70, 49-52.) However, Plaintiff does not allege that he did either.

Plaintiff also alleges that an AUID is disclosed to Google, and cites a social media posting calling this AUID a "unique pseudo-id for a user" (*Id*. ¶ 21). But a *pseudo* id is not an identifier that points to a person. Plaintiff once again pleads himself out of court. The posting Plaintiff cites, a LinkedIn article titled, "One of the Reasons Why Google Ads Conversion Tags on GRM Are Showing the Failed Status,"[5] specifies that Google uses the AUID to internally retrieve and match the user-provided data that was sent *earlier* (data such as email, phone, address, called "-em" in the post). *Id.* Here, however, there are no allegations that any data was sent earlier. There are no allegations that Plaintiff even has a Google account; that he has signed

to interpret this code, without Plaintiff's emphases with red boxes, 'with little or no extra effort . . . .'" *Id*. (quoting *Solomon*, 136 F.4th at 54).

[5] Compl. n.29 (citing https://www.linkedin.com/pulse/one-reasons-why-google-ads-conversion-tags-gtm-failed-giovani-ftghf).

into a Google account; or that he has turned on Ads Personalization such that this purported disclosure would allow Google to identify him through any Google account or any information sent to Google earlier. The "detective work" necessary to connect this data to an actual person is precisely what *Yershov* found inadequate to qualify this type of data as PII.

Plaintiff does allege that some cookies are still activated even when a user is not logged into a Google account, such as the _ga cookie. (*Id*. ¶ 30.) Putting aside that Plaintiff has not alleged whether he met all the requirements for the full array of alleged cookies to be transmitted, Plaintiff has not plausibly alleged that these types of cookies are enough for Google to identify an individual user and the video he or she watched based, as made clear from a review of Google's own policies and support pages that Plaintiff repeatedly cites in the Complaint. Those policies make clear that Google Analytics, for example, is meant to "report site usage statistics" to businesses "*without personally identifying individual visitors*."[6] The "_ga cookie" that Plaintiff alleges Defendant discloses to Google allows Google to "distinguish one visitor from another," but that does not mean that it allows Google to identify a *specific* person. In fact, the policy site says: "Each '_ga' cookie is unique to the specific property, so it cannot be used to track a given user or browser across unrelated websites." *Id.*

There are no allegations that Becker has disclosed any other types of information that would be identifying of Garcia. In contrast, in other VPPA cases that survived a motion to dismiss in this Circuit, plaintiff pled that the defendant disclosed geolocation information on its

[6] *See* Google, How Google Uses Cookies, https://policies.google.com/technologies/cookies?hl=en-GB (last visited Oct. 1, 2025) (emphasis added). This Court may consider this site on this Motion in the interest of completeness because Plaintiff cited numerous other explanatory support pages relating to cookies from Google's corporate domain. *See, e.g., Tassinari v. Salvation Army Nat'l Corp*., 610 F.Supp.3d 343, 360 n.14 (D. Mass. 2022) (complaint repeatedly cited portion of website so other pages incorporated by reference).

own (or with other data), which was sufficient to constitute PII. In *Yershov*, the First Circuit determined that alleged disclosure of GPS coordinates of the phone's location at the time the videos were watched were enough to "enable most people to identify" the "likely" home and work addresses of the viewer . . . ." 820 F.Supp. 3d at 486. Later cases are in accord. *E.g. Louth v. NFL Enters. LLC*, 2022 WL 4130866, at *3 (D.R.I. Sept. 12, 2022) (plaintiff "buttresse[d] his assertion that geolocation and AAID are PII with argument that the combination of the two allows Google to identify specific users . . . ."); 2024 WL 381344 at *16 (alleging that GPS location that determined a meaningful location was disclosed).[7] Here, Plaintiff alleges *nothing* about geolocation information—nor any other type of identifying information whatsoever.

**2. *The Alleged Disclosure to Meta***

Regarding the alleged Meta disclosure, Plaintiff fares no better. He alleges that two pieces of information that allegedly identify him are disclosed. The first is a browser ID, and Plaintiff admits that it simply identifies a browser, not a person. (Compl. ¶ 34.) Plaintiff alleges that the "the browser ID value, along with other 'customer information parameters[,]' is ultimately 'matched to Meta accounts.'" *Id.* The cited website explains that a browser is of "medium value" in helping Meta match the data to a Facebook user.[8] Plaintiff does not allege he

---

[7] Notably, in *Therrien v. Hearst*, 2025 WL 1208535 (D. Mass. April 25, 2025), on a summary judgment motion, the court found that the geolocation data was *still* not enough to identify the person since it revealed a public location. Further, the unique customer ID disclosed was also not enough because it was only linked to a device, not a person. Nor was an email address enough since there was no evidence that defendant could link the address to plaintiff.

[8] *Id*. n.48, (citing https://www.facebook.com/business/help/765081237991954?id=818859032317965).

has a Meta account to match anything to, and it is not clear how this information is "matched" with a medium-quality input even for someone who has a Facebook account.[9]

Plaintiff alleges that a hashed phone number is disclosed to Meta, but that does not help him. He does not sufficiently allege that Meta foreseeably uses that hashed number to identify a person. (Compl. ¶ 35). He claims that Meta states it can use hashed information and compare it to its own hashed information to build custom audiences. (*Id*. ¶ 37, n.56). The page cited[10] states that hashing "turns the information in your customer list into randomized code. The process cannot be reversed." That page does not specify that hashed phone numbers specifically are part of any hashed information Meta has on hand associated with an individual (even if one actually had a Facebook account). *Id.* Plaintiff cites the FTC as stating that hashing is an insufficient method to anonymize information because it can be decoded and traceable to individuals. (*Id*. ¶ 37, n.54.) But there are no allegations that Meta actually decodes the hashed phone number and identifies it with individuals. Separately, that a hashed phone number can be decoded does not mean that Meta is foreseeably likely to use it to identify an individual, as *Yershov* requires.

**CONCLUSION**

For the foregoing reasons, Defendant Becker Professional Development Corporation. respectfully requests that this Court dismiss Plaintiff's Complaint, in its entirety, with prejudice.

---

[9] It is certainly not clear how an "ordinary person" could "easily" tell who a person is from a browser ID as Plaintiff claims. And, even if Plaintiff had a Meta account, and Becker allegedly disclosed a Facebook ID (which it did not), that is still not sufficient. *See, e.g., Heerde v. Learfield Communications, LLC*, 741 F.Supp.3d 849, 857 (C.D. Cal. 2024) (finding "the person's Facebook profile [must be] publicly accessible and include[] sufficient identifying information"); *Ghanaat v. Numerade Labs, Inc*., 689 F.Supp.3d 714 (N.D. Cal. 2023) (allegations inadequate because plaintiffs "do not allege their Facebook pages contain any personal information, such as their names or email addresses").

[10] Compl. 37, n.56 (citing https://www.facebook.com/business/help/112061095610075?id=2469097953376494).

Dated: October 1, 2025

Respectfully submitted,

BECKER PROFESSIONAL
DEVELOPMENT CORPORATION

By its attorneys,

/s/ *Tony K. Lu*

Tony K. Lu (BBO# 678791)
DENTONS US LLP
101 Federal Street
Suite 1900
Boston, Massachusetts 02110
Tel: (617) 235-6817
tony.lu@dentons.com

Kristen C. Rodriguez (*admitted pro hac vice*)
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Tel: (212) 768-6700
Email: kristen.rodriguez@dentons.com

Lyndsey M. Wajert (*admitted pro hac vice*)
DENTONS US LLP
233 South Wacker Drive
Suite 5900
Chicago, IL 60606
Tel: (312) 876-8000
Email: lyndsey.wajert@dentons.com

**CERTIFICATE OF SERVICE**

I certify that on October 1, 2025, I caused to be filed electronically a true copy of the foregoing document with the Clerk of the Court using the CM/ECF system, which will notify the parties of record via electronic notification.

/s/ *Tony K. Lu*