**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MICHAEL GARCIA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BECKER PROFESSIONAL DEVELOPMENT CORPORATION,<br><br>Defendant. | Case No. 1:25-cv-12157-JEK<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BECKER PROFESSIONAL DEVELOPMENT CORPORATION'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION .......... 1

BACKGROUND .......... 2

I. Becker's Limited, Superficial Contacts with Massachusetts .......... 2

II. The VPPA and Plaintiff's VPPA Allegations .......... 4

LEGAL STANDARD .......... 6

ARGUMENT .......... 6

I. The Court Lacks Personal Jurisdiction Over Becker .......... 6

A. Becker Is Not Subject to General Jurisdiction in Massachusetts .......... 7

B. Becker Is Not Subject to Specific Jurisdiction in Massachusetts .......... 7

1. Plaintiff Cannot Satisfy the Long-Arm Statute .......... 7

a. The claims do not arise from Becker's transaction of business here. .......... 8

b. Becker has not caused "tortious injury by an act or omission" here. .......... 9

c. Becker neither caused tortious injury nor regularly does or solicits business in Massachusetts. .......... 10

2. Exercising Personal Jurisdiction Here Would Violate Due Process .......... 10

a. No Purposeful Availment .......... 10

b. No Relatedness .......... 12

c. No Reasonableness .......... 13

II. Plaintiff Has Failed to State a Claim Under the VPPA .......... 13

A. Plaintiff Has Not Alleged That the Title of a Specific Video Was Disclosed .......... 15

B. Plaintiff Has Not Alleged That Becker Disclosed Information That Would Identify Him .......... 16

CONCLUSION .......... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....6

*Connoisseurs Prods. Corp. v. Fresh Finest, LLC*,
2025 WL 786660 (D. Mass. Mar. 12, 2025)....7

*Cossaboon v. Maine Med. Ctr.*,
600 F.3d 25 (1st Cir. 2010)....11

*Egan v. X-Mode Social Inc.*,
2024 WL 2701967 (D. Mass. May 24, 2024)....13

*Frawley v. Nexstar Media Grp., Inc.*,
2023 WL 6065768 (D. Mass. Sept. 18, 2023)....7, 8, 10, 11

*Garagesocial, Inc. v. Hagerty Grp., LLC*,
2025 WL 1676511 (D. Mass. June 13, 2025)....9

*Golden v. NBCUniversal Media, LLC*,
2025 WL 2530689 (S.D.N.Y. Sept. 3, 2025)....14

*Hughes v. Nat'l Football League*,
2025 WL 1720295 (2d Cir. June 20, 2025)....14

*Hussain v. Rhode Island Hosp.*,
2019 WL 3546888 (D. Mass. June 12, 2019)....9

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945)....1

*Joiner v. NHL Enterprises, Inc.*,
2025 WL 2846431....14

*Krua v. Sirleaf*,
2019 WL 1936733 (D. Mass. May 1, 2019)....10

*Kuan Chen v. United States Sports Acad., Inc.*,
956 F.3d 45 (1st Cir. 2020).... *passim*

*Louth v. NFL Enters. LLC*,
2022 WL 4130866 (D.R.I. Sept. 12, 2022)....18

*A.G. ex. rel. Maddox v. Elsevier, Inc.*,
732 F.3d 77 (1st Cir. 2013) ........................................................................................6

*Mass Schl. of L. at Andover, Inc. v. Am. Bar Ass'n*,
142 F.3d 26 (1st Cir. 1998) ........................................................................................7

*Motus, LLC v. CarData Consultants, Inc.*,
23 F.4th 115 (1st Cir. 2022)......................................................................................6, 12

*Motus, LLC v. CarData Consultants, Inc.*,
520 F.Supp.3d 87 (D. Mass. 2021) aff'd, 23 F.4th 115 (1st Cir. 2022)..............................7, 12

*Nixon v. Pond5, Inc.*,
2025 WL 2030303 (S.D.N.Y. July 21, 2025) ..............................................................15

*Pettengill v. Curtis*,
584 F.Supp.2d 348 (D. Mass. 2008) ..........................................................................10

*Power v. Connectweb Techs., Inc.*,
648 F. Supp. 3d 321, 337 (D. Mass. 2023) ..................................................................12

*Rancourt v. Meredith Corp.*,
2024 WL 381344 (D. Mass. Feb. 1, 2024) ...............................................................15, 18

*Restuccia v. H&R Block Tax Servs. LLC*,
2021 WL 4658734 (D. Mass. Oct. 7, 2021)................................................................10

*Salazar v. National Basketball Association*,
2025 WL 2830939 (S.D.N.Y Oct. 6, 2025) ..................................................................14

*SCVNGR, Inc. v. Punchh, Inc.*,
2018 WL 6492729 (Mass. Super. Sept. 17, 2018)............................................................9

*Solomon v. Flipps Media, Inc.*,
136 F.4th 41 (2d Cir. 2025) ........................................................................................14

*Taino v. Bow Tie Cinemas, LLC*,
2025 WL 2652730 (S.D.N.Y. Sept. 16, 2025)...........................................................14, 16

*Tassinari v. Salvation Army Nat'l Corp.*,
610 F.Supp.3d 343 (D. Mass. 2022) ..........................................................................17

*Therrien v. Hearst*,
2025 WL 1208535 (D. Mass. Apr. 25, 2025) ..............................................................18

*Tobias v. Smith*,
2022 WL 1129376 (D. Mass. Apr. 15, 2022) ................................................................6

*Yershov v. Gannett Satellite Info. Network, Inc.*,
820 F.3d 482 (1st Cir. 2016) .......... *passim*

**Statutes**

18 U.S.C.
§ 2710 .......... *passim*
§ 2710(b)(1) .......... 14

Mass. Gen. Laws
ch. 223A § 3 .......... *passim*

**Rules and Regulations**

Fed. R. Civ. P.
Rule 12(b)(2) .......... 6
Rule 12(b)(6) .......... 6, 13

**Other Authorities**

134 Cong. Rec. S5397-01, 1988 WL 170802 (May 10, 1988) .......... 4, 15

Giovani Ortolani Barbosa, Jan. 23, 2025, One of the Reasons Why Google Ads Conversion Tags on TGM are showing the "Failed" Status, https://www.linkedin.com/pulse/one-reasons-why-google-ads-conversion-tags-gtm-failed-giovani-ftghf .......... 17

Google, How Google Uses Cookies, https://policies.google.com/technologies/cookies?hl=en-GB (last visited Nov. 19, 2025) .......... 17

https://www.facebook.com/business/help/112061095610075?id=2469097953376494 .......... 19

https://www.facebook.com/business/help/765081237991954?id=818859032317965 .......... 19

S. Rep. No. 100-59 (1988) .......... 4

U.S. Const. amend. XIV § 1 .......... 7, 10

## INTRODUCTION

The Amended Complaint is an attempt by counsel for Plaintiff to forum shop for a court they perceive as receptive to this putative class action under the Video Privacy Protection Act ("VPPA"). However, this Court lacks personal jurisdiction over Defendant Becker Professional Corporation. Becker is not "at home" in Massachusetts: it is not headquartered here, owns no property here, and does not have an office here. While Plaintiff points to Massachusetts-specific webpages, university and employer partnerships, and textbook shipments to the Commonwealth, none of that reflects targeting of Massachusetts specifically. Becker provides comparable state pages to reflect differing requirements across jurisdictions; its partnerships and employer relationships exist across the nation; and its textbook shipments are routine nationwide fulfillment triggered by a user's request. Further, there is no nexus between the alleged conduct under the VPPA and this forum, as there is nothing connecting the Commonwealth to the alleged disclosure by Becker of Plaintiff's video activity to third parties. Plaintiff's Massachusetts residency is the sole tie to the Commonwealth and is plainly insufficient. Allowing jurisdiction based on a nationwide website with national offerings would invite suit against any national business in Massachusetts, thus contravening Due Process and "offend[ing] 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

Even if this Court were to determine that there is personal jurisdiction over Becker, the VPPA claim fails. The Amended Complaint stretches the law beyond recognition, relying on technical jargon and lengthy footnotes rather than plausible, specific allegations. It does not allege that Becker disclosed information that could reasonably and foreseeably identify Plaintiff as an individual, rather than merely his device or browser, or link him to the viewing of a particular video. Generic references to analytics and marketing tools are not enough; the statute requires disclosure that actually identifies both a person and the specific video content viewed.

## BACKGROUND

### I. Becker's Limited, Superficial Contacts with Massachusetts

Becker is a provider of web-hosted exam review courses and continuing professional education for accounting professionals. (Declaration of Angeline Brown ("Decl.") ¶ 3.) It is incorporated in Delaware and headquartered in Missouri. (*Id*.) Becker owns no real property in Massachusetts and maintains no offices here. (*Id*. ¶ 5.) Of the 171 individuals who provide dedicated services to Becker, only four reside in Massachusetts. None of these employees oversees what data the Website collects, the operation of any video content, or the sharing of any related data with third parties. (*Id*. ¶¶ 7, 21.) None of the courses Becker offers have any Massachusetts-specific content. (*Id*. ¶¶ 11-12.)

Becker's Website is accessible to anyone with an internet connection. (*Id*. ¶ 4.) Users must create an account and pay to access course materials beyond an optional free trial period. (*Id*.) In 2024, only 2.1% of Becker's overall revenue was attributable to Massachusetts. (*Id*. ¶ 8.) The number of users who purchased course materials and provided a Massachusetts billing or shipping address was similarly limited to under 3% of total users in each of the last three years. (*Id*. ¶ 9.)

Consistent with the national scope of its offerings, Becker's paid advertisements use national, regional, multi-state, or non-geographic parameters. (*Id*. ¶ 23.) Becker maintains no Massachusetts-specific social-media handles; it runs no Massachusetts-exclusive geofenced or geo-targeted campaigns; and it does not send Massachusetts-exclusive print pieces, postcards, flyers, or other direct-mail solicitations. (*Id*.) Any emails, social media posts, or physical mailings that users receive are either triggered by user-initiated interactions with the Website or distributed across multiple states, not tailored to Massachusetts. (*Id*.)

While Plaintiff points to some Massachusetts content on Becker's Website, none of those pages actually reflect state-specific targeting:

- *Printed course materials shipped to MA* (Am. Compl. ¶ 79): Plaintiff offers this as evidence of commerce directed into the forum, but not only were these shipments incidental to user-initiated purchases and not part of any Massachusetts-directed distribution program, only 2% of textbooks shipped in the last three years were shipped to Massachusetts. (Decl. ¶ 16).

- *"Massachusetts CPA license renewals" page* (Am. Compl. ¶ 80): That page is one of 51 parallel state pages that provide high-level, informational summaries concerning differing state licensure requirements. (Decl. ¶ 14.) None of the 51 state pages contains video content. (*Id*.)

- *"Massachusetts CPE requirements" page* (Am. Compl. ¶ 81): Becker's Continued Professional Education or "CPE" requirements page provides generalized information across 51 states and jurisdictions. Becker offers CPE courses that may satisfy multiple states' requirements, but does not provide Massachusetts-specific CPE content. (*Id.* ¶¶ 11, 15.) The CPE requirements page does not include video content. (*Id.* ¶ 15.)

- *Partnership with the Massachusetts Society of CPAs*. (Am. Compl. ¶¶ 83-84): Becker maintains relationships with a wide range of organizations nationwide. (Decl. ¶ 17.) The Massachusetts Society of CPAs is one of 58 organizations listed as partners, alongside national, regional, and highly localized entities across the country. (*Id*. ¶ 18.)

- *Direct-bill or preferred provider arrangements with MA entities* (Am. Compl. ¶ 84): Becker has these relationships with entities in numerous states across the country. (Decl. ¶ 20.) These third-party relationships are not targeted to Massachusetts, are not unique to Massachusetts, and have no connection to the Website's video functionality or any alleged data-sharing practices. (*Id*.)

- *Local Becker representatives* (Am. Compl. ¶ 82): Plaintiff includes a snippet of a page with information about representatives, but those representatives serve entire regions, not just Massachusetts. Further, they serve exclusively in a business-to-business capacity, do not handle consumer accounts, and they do not handle or control any Website data. (*Id.* ¶ 21.)

Notably, Plaintiff does not allege that he subscribed to Becker's offerings through any Massachusetts associations, universities, or other partnerships; he does not allege he had a textbook shipped to Massachusetts, used a direct-billing service, or contacted any representative. Becker's records confirm none of these activities occurred. (Decl. ¶ 24.)

## II. The VPPA and Plaintiff's VPPA Allegations

The VPPA, passed in 1988 in response to a newspaper's publication of then-Supreme Court nominee Robert Bork's video rentals, prohibits video tape service providers from knowingly disclosing personally identifiable information ("PII"), defined as information that identifies a consumer as having requested or obtained specific video materials. Thus, a violative disclosure must contain *both* information that identifies a person and information that identifies the specific video materials that person requested or obtained, *i.e.*, the *titles* of the videos. *See* S. Rep. No. 100-59 (1988) (describing list of movies Bork rented, the publication of which spurred the VPPA, noting the bill "prohibits video stores from disclosing 'personally identifiable information'—information that links the customer or patron to particular materials or services"); 134 Cong. Rec. S5397-01, 1988 WL 170802 (May 10, 1988) (video stores can sell customer lists, but "cannot disclose the *particular* films their customers have rented.") (emphasis added).

Plaintiff alleges that Becker unlawfully disclosed users' specific video viewing data to third parties, specifically Google and Meta, through the use of website tracking technologies. Plaintiff alleges that when a user watches a video on Becker's website, certain information is transmitted—purportedly video titles, URLs, and user identifiers—to Google and Meta via tools such as Google Analytics and the Meta Pixel. Plaintiff claims this alleged transmission constitutes a violation of the VPPA.

Despite the Complaint's lengthy footnotes, Plaintiff's allegations are notably generic and lack critical specifics. Plaintiff alleges that he created a Becker account and watched pre-recorded videos on the Becker Website (Am. Compl. ¶ 66), but he does not identify any particular video that he himself viewed or whose title or viewing information was disclosed. Instead, he cites a single example of a video allegedly disclosed to third parties (*Id.* ¶¶ 19, 20, 31, 32). With respect to Google, Plaintiff alleges that various "cookies" are transmitted that allow

Google to remember users' activities when logged into a Google account and have turned on Ads Personalization. None of the cited materials states that the particular identifiers (such as the _ga cookie, or an "AUID" identifier) inherently identify a person, much less that Becker disclosed a person's identity tied to a specific video title in the same transmission. For the "AUID" identifier, for example, Plaintiff does not allege that any information was previously provided to Google as necessary to identify him, according to the footnotes he cites. (*Id.* ¶ 21).

Moreover, with respect to Meta, Plaintiff alleges that the Website transmits hashed phone numbers and browser IDs, but he does not allege his Facebook account ID was disclosed; that he was logged into Facebook while watching videos on the Website; or that Meta could use any of the transmitted information to identify him as having watched a specific video. (*E.g.*, *id.* ¶ 70.) The Complaint also fails to allege that Meta will likely identify him from the hashed phone number or browser ID, or that Meta would connect any video-viewing activity to his identity.

Further, Plaintiff's own allegations cast doubt on whether the information transmitted to Google or Meta constitutes the title of any video he viewed. For Meta, Plaintiff references a field called "cd[pageFeatures]," asserting that it contains the video title, but he provides no explanation or factual support for why this field should be understood as the actual title of a video, as opposed to some other page feature or metadata. (*Id.* ¶¶ 31, 32). For Google, Plaintiff points to a field labeled "dt," which he claims contains the video title (*id.* ¶¶ 19, 20), even though this field differs from the Facebook disclosure for the same video; he claims it also includes the category for the video, with no support for that allegation. Plaintiff does not sufficiently allege whether this field reflects the title of a video watched by the user or merely some other, non-actionable descriptive element of the webpage.

## LEGAL STANDARD

On a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), the plaintiff bears the burden of proving jurisdiction exists. Under the prima facie standard, where the court "is called to" decide the motion "without first holding an evidentiary hearing," the plaintiff cannot merely rely on "unsupported allegations" in a complaint. *Tobias v. Smith*, 2022 WL 1129376, at *2 (D. Mass. Apr. 15, 2022). Instead, the plaintiff "must put forward evidence of specific facts to demonstrate that jurisdiction exists." *Id*. (internal citation omitted).

In federal question cases such as this one, when the federal statute is silent on the availability of nationwide service of process, as the VPPA is, "a plaintiff who seeks to hale a defendant into court in a particular forum not only must comply with the forum's long-arm statute" and "show that exercising such jurisdiction will comport with the requirements of due process." *Motus, LLC v. CarData Consultants, Inc.*, 23 F.4th 115, 122 (1st Cir. 2022). *See also Kuan Chen v. United States Sports Acad., Inc*., 956 F.3d 45, 54 (1st Cir. 2020).

Under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 570 (2007)). To survive a motion to dismiss for failure to state a claim, the plaintiff must show "more than a sheer possibility" of liability. *A.G. ex. rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 80 (1st Cir. 2013) (citation omitted).

## ARGUMENT

### I. The Court Lacks Personal Jurisdiction Over Becker

Plaintiff cannot meet his burden of demonstrating this Court has personal jurisdiction over Becker. Becker is subject to neither general jurisdiction in Massachusetts, nor to specific

jurisdiction under the Massachusetts' long-arm statute. Mass. Gen. Laws Ann. ch. 223A, § 3 ("Long-Arm Statute"); *Frawley v. Nexstar Media Grp., Inc.*, 2023 WL 6065768, at *4–5 (D. Mass. Sept. 18, 2023). Plaintiff similarly cannot show that the Court's exercise of jurisdiction over Becker would comport with the requirements of Due Process. *Motus, LLC v. CarData Consultants, Inc.*, 520 F.Supp.3d 87, 90 (D. Mass. 2021), *aff'd*, 23 F.4th 115 (1st Cir. 2022).

### A. Becker Is Not Subject to General Jurisdiction in Massachusetts

Becker is not subject to general jurisdiction in Massachusetts because it is not at "home" here. A corporation is "at home" in its "state of incorporation and the state that houses its principal place of business." *Frawley*, 2023 WL 6065768, at *4 n.1 (citation omitted). Becker is headquartered in St. Louis, Missouri, incorporated in Delaware, and has no business operations in Massachusetts; any limited contacts it has with Massachusetts are not "so unusually substantial" and "sufficiently continuous and systematic 'as to render [it] essentially at home'" here. *Chen*, 956 F.3d at 57. Indeed, "the mere whiff of a virtual presence" is not enough for the purposes of general jurisdiction. *Id.* at 57–58.

### B. Becker Is Not Subject to Specific Jurisdiction in Massachusetts

Plaintiff must establish that specific jurisdiction 1) is permitted by the Long-Arm Statute and 2) comports with the Due Process Clause of the Fourteenth Amendment. *Motus, LLC*, 520 F.Supp.3d at 91. Plaintiff fails on both fronts.

#### 1. Plaintiff Cannot Satisfy the Long-Arm Statute

A claim must arise from the alleged Massachusetts-based activities to satisfy the Long-Arm Statute. *Connoisseurs Prods. Corp. v. Fresh Finest, LLC*, 2025 WL 786660, at *5 (D. Mass. Mar. 12, 2025); *see, e.g., Mass Schl. of L. at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 34 (1st Cir. 1998) (exercise of specific jurisdiction is limited to when there is a "demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities"). The prongs of the Long

Arm Statute Plaintiff appears to invoke here are Sections 3(a) (claims arising from "transacting any business in this commonwealth") and 3(c) (claims arising from "causing tortious injury by an act or omission in this commonwealth"), but neither applies. Section 3(d) of the Long-Arm Statute is similarly unavailable because this Court lacks general jurisdiction over Becker.

*a. The claims do not arise from Becker's transaction of business here.*

Section 3(a) of the Long-Arm Statute requires that Plaintiff's claims "arise from" Becker's transaction of business here based on a "but for" causation test. *Frawley*, 2023 WL 6065768, at *4. "[I]solated transactions unaccompanied by 'purposeful intent' on the part of [a] defendant[ ] and having only a 'slight effect on the commerce of the Commonwealth' are not enough to support jurisdiction" under Section 3(a). *Id.*

Plaintiff's claim here arises, if at all, from alleged website pixel activity when a user "watches a pre-recorded video on Becker's Website." (Am. Compl. ¶¶ 15, 17, 19, 31.) However, there is no connection between any Website operations and Massachusetts. (Decl. ¶6.) Further, none of the allegedly Massachusetts-directed activities Plaintiff identifies in his Amended Complaint—such as shipping textbooks, listing state licensure requirements, or partnering with local entities—constitutes the "but-for cause" of his alleged injury under the VPPA. A textbook cannot give rise to a VPPA violation. Plaintiff cites a standalone webpage listing licensure requirements in Massachusetts; yet the page is entirely separate from coursework, contains no video content, and therefore cannot give rise to the video-related violation. And partnering with local organizations has no nexus to whether a user accesses course materials that contain videos.

Thus, the claim itself does not arise from any activity in Massachusetts, and Plaintiff has and cannot plausibly plead facts establishing the required "but-for" causation of his claims, which centers on the alleged disclosure of information *tied to the viewing of video content.* Without allegations tethering the supposed disclosure of his viewing data to Becker's

Massachusetts-directed conduct, Plaintiff cannot show that Becker's isolated contacts with Massachusetts are the but-for cause of his injury.

*b. Becker has not caused "tortious injury by an act or omission" here.*

Plaintiff has similarly failed to establish jurisdiction under Section 3(c) of the Long-Arm Statute, as he cannot establish that his "action arises from [Becker] causing tortious injury by an act or omission in Massachusetts." *Garagesocial, Inc. v. Hagerty Grp., LLC*, 2025 WL 1676511, at *4 (D. Mass. June 13, 2025) (quotation omitted). Ultimately, "Section 3(c) 'is intended to apply only when the act [or omission] *causing* the injury *occurs within the Commonwealth*.'" *Id*. (emphasis added). Notably, "the fact that [ ] 'harm' is felt by [a plaintiff] in Massachusetts does not mean that infringement occurred here." *Id*. (citation omitted).

Plaintiff alleges that Plaintiff is a resident and citizen of Massachusetts, (Am. Compl. ¶¶ 66, 74), and claims that Becker collected and disseminated the personally identifiable information and video-viewing information giving rise to this lawsuit in this District. (*Id*. ¶ 78.) It is not at all plausible, however, that Becker disclosed this information to Google and Meta—the conduct that allegedly violated the VPPA—in Massachusetts, given that none of Becker's website operations are based in Massachusetts (Decl. ¶ 6), and there is no allegation that Meta or Google's operations are based in Massachusetts either. *See, e.g.*, *Hussain v. Rhode Island Hosp.*, 2019 WL 3546888, at *4 (D. Mass. June 12, 2019) ("Section § 3(c) is inapplicable because there are no facts which demonstrate that defendants took any action in Massachusetts."); *SCVNGR, Inc. v. Punchh, Inc.*, 2018 WL 6492729, at *4 (Mass. Super. Sept. 17, 2018) (Section 3(c) "bases jurisdiction on where the tortious act was undertaken, not where its effect was felt, even when the defendant knew that the plaintiff was located in Massachusetts"). And while the focus for this prong is on Defendant's activities, Plaintiff does not even plead that he was in Massachusetts when he requested or obtained specific videos giving rise to the violation.

*c. Becker neither caused tortious injury nor regularly does or solicits business in Massachusetts.*

Plaintiff similarly cannot rely on Section 3(d) of the Long-Arm Statute, which only applies if general jurisdiction exists over the defendant. *Pettengill v. Curtis*, 584 F.Supp.2d 348, 357 (D. Mass. 2008). *See also Frawley*, 2023 WL 6065768, at *4 ("the Court can only rely on Section 3(d) when it has general jurisdiction over the defendants").[1] As noted above in *supra* section IA, general jurisdiction does not exist here because Becker is not "at home" in Massachusetts. *E.g. Frawley*, 2023 WL 6065768, at *4.

2. Exercising Personal Jurisdiction Here Would Violate Due Process

Even if Plaintiff could demonstrate that jurisdiction is authorized under the Long-Arm Statute, which he cannot, haling Becker into court here would offend due process. "The Due Process Clause imposes three requirements for exercising specific jurisdiction over out-of-forum defendants." *Chen*, 956 F.3d at 59. First, "the plaintiff's claim must directly arise from or relate to the defendant's activities in the forum." *Id*. Second, "the defendant's forum-state contacts must 'represent a purposeful availment of the privilege of conducting activities in that state.'" *Id*. Third, "the exercise of specific jurisdiction in the forum must be reasonable under the circumstances." *Id.* "Failure to make any one of these showings" is fatal to specific personal jurisdiction. *Id*.

*a. No Purposeful Availment*

"When, as here, the contacts in question are related to a website that is available in the forum but that is operated outside of it, the Court's focus should begin with the purposeful availment prong." *Frawley*, 2023 WL 6065768, at *5. To demonstrate purposeful availment, the

[1] *See also Restuccia v. H&R Block Tax Servs. LLC*, 2021 WL 4658734, at *5 (D. Mass. Oct. 7, 2021) (same); *Krua v. Sirleaf*, 2019 WL 1936733, at *4 (D. Mass. May 1, 2019) (same).

court considers "voluntariness" and "foreseeability"—"the contacts must be voluntary rather than the result of unilateral actions of another party." *Id.* They must also be sufficient to give the defendant notice '"such that [it] could 'reasonably anticipate being haled into court' involuntarily in the Commonwealth." *Id*. (citations omitted). The mere accessibility of a website in the forum is not enough; courts require "something more," lest internet ubiquity "eviscerate" constitutional limits on personal jurisdiction. *Cossaboon v. Maine Med. Ctr.*, 600 F.3d 25, 35, n.25 (1st Cir. 2010); *see also Chen* 956 F.3d at 60–61.

Courts applying this standard in internet cases—including VPPA cases—regularly reject purposeful availment where a nationally accessible site lacks specific forum-directed outreach or significant forum-tethered revenue. Generic foreseeability that some Massachusetts residents may access a website is insufficient. *See Frawley*, 2023 WL 6065768, at *5–6 (no purposeful availment where TheHill.com was accessible in Massachusetts with Massachusetts subscribers and articles of interest to residents without forum-specific targeting); *Chen*, 956 F.3d at 60–61 (no purposeful availment based on an online learning platform absent evidence the site "aim[ed]" at Massachusetts or "derive[d] significant revenue" from Massachusetts residents); *Cossaboon*, 600 F.3d at 35–36 (similar).

Here, the facts do not show voluntary Massachusetts-directed conduct by Becker. Nor do they show forum targeting tied to the VPPA claim. To start, Becker's website is globally accessible and not tailored to Massachusetts. The "Massachusetts" pages Plaintiff highlights are part of 51 parallel state pages that provide generic, high-level information reflecting differing state requirements that contain no video content and do not drive the alleged transmissions. Decl. ¶ 14. The same is true for Becker's CPE requirements pages and the CPE course offerings, which are the same nationwide – there are no Massachusetts-specific courses. Id. ¶ 15. *C.f.*

*Power v. Connectweb Techs., Inc.*, 648 F. Supp. 3d 321, 337 (D. Mass. 2023) (sales of products that may "only be used by Massachusetts notaries" was insufficient to establish "how [defendant] 'has sought to serve Massachusetts residents in particular' rather than residents of nearly all fifty states") (quoting *Motus*, 23 F.4th at 125).

Becker also does not target Massachusetts residents for sales. Becker runs national or multi-state campaigns, maintains no Massachusetts-specific social-media handles, and does not run Massachusetts-exclusive geofenced campaigns or send Massachusetts-exclusive direct mail. (Decl. ¶ 23.) The purported "Massachusetts" representatives cited cover multiple states, operate in a business-to-business capacity, and have no role in video content, data collection, or disclosure to third parties. (*Id.* ¶ 21.)

Further, the record reflects only a "broad and generic" foreseeability that national users, including a small fraction in Massachusetts, might purchase courses or consumer content. Massachusetts accounts for only 2.1% of Becker's 2024 revenue, with roughly 2.5% of users listing Massachusetts addresses across the past three years. And since December 1, 2022, only about 2% of nationwide printed shipments were delivered to Massachusetts addresses. (Decl. ¶¶ 9, 16.) Those figures underscore a national footprint with minimal forum engagement and do not support a reasonable anticipation of being haled into a Massachusetts court for alleged Website code behavior that runs elsewhere.

*b. No Relatedness*

The relatedness prong requires a "'demonstrable nexus' between the claims of the plaintiff and the defendant's contacts in the forum state." *Motus*, 520 F.Supp.3d at 91, (internal citation omitted), *aff'd*, 23 F.4th 115 (1st Cir. 2022). Plaintiff once again summarily claims that "[Becker's] conduct giving rise to this action arises out of and relates to [its] business," but this is not enough. (Am. Compl. ¶ 78.) Plaintiff does not plead that the alleged violation—Becker's

purported disclosure of data to Facebook and Google through codes on the Website—is tied to any act or omission *in Massachusetts*, and thus the claim is not related to the Commonwealth. *See Egan v. X-Mode Social Inc*., 2024 WL 2701967 (D. Mass. May 24, 2024) (though the initial collection of geolocation data through defendant's app was in Massachusetts, that was not enough to make the claim—the *sale* of that geolocation data—related to Massachusetts). Nor is it plausible that the allegedly violating disclosure would be related to Massachusetts—indeed, Becker does not engage in geolocation-specific targeting, the VPPA claim here does not arise out of any of geolocation-specific activities, and Plaintiff does not even allege he accessed videos from Massachusetts.

*c. No Reasonableness*

Finally, the exercise of jurisdiction must be reasonable under the circumstances. *Chen*, 956 F.3d at 59. Litigating in Massachusetts forum imposes a burden on Becker, which does not have employees in this state who can testify about the claims at issue. While Massachusetts has an interest in protecting the rights of its citizens, this case does not raise any novel issues that would impact Massachusetts law as this case is based exclusively on a federal statute. Massachusetts has no special stake in this case, and it is reasonable for Becker not to expect to be haled into court here. In short, the exercise of jurisdiction over Becker does not comport with due process. For this reason alone, the Court should dismiss for lack of personal jurisdiction.

## II. Plaintiff Has Failed to State a Claim Under the VPPA

Even if this Court were to find personal jurisdiction, the Complaint should nonetheless be dismissed under Rule 12(b)(6). The VPPA is not a catch-all privacy statute; Congress imposed exacting requirements for a violation when it passed it in 1988, and Plaintiff has not met them. To state a claim, Plaintiff must plausibly allege that Becker "knowingly" disclosed his personally identifiable information ("PII") to a third party. 18 U.S.C. § 2710(b)(1). PII "includes

information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *Id.* at § 2710(a)(3). In the First Circuit, PII comprises "information reasonably and foreseeably likely to reveal which videos [a person] has obtained." *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016). This does not encompass every disclosure of code, as the recipient must be foreseeably likely to connect an individual and a specific video requested or obtained. The information ceases to be PII at a point "at which the linkage of information to identity becomes too uncertain, or too dependent on too much yet-to-be-done, or unforeseeable detective work." *Id*.

The generic example Plaintiff provides of the disclosure of information relies heavily on this "yet-to-be done" work, highlighting the pseudonymous, browser-focused nature of the allegations. Plaintiff fails to bridge the gap from alleging that the analytics tools received browser identifiers and video URLs to non-conclusory allegations that Google or Meta would likely identify a specific person requested or obtained a specific video.[2]

[2] Despite Plaintiff's repeated allegations that an ordinary person could decipher this information to identify a person and the video he or she watched, Plaintiff's claims plainly would not survive under the Second Circuit's "ordinary person" standard. In *Solomon v. Flipps Media, Inc.*, 136 F.4th 41 (2d Cir. 2025), the Second Circuit held that an ordinary person could not decipher the identify of a user, even when a Facebook ID connected to a Facebook account was disclosed. Here, there are even fewer identifying allegations—just that a hashed phone number and a cookie that identifies a browser was disclosed. Multiple decisions following *Solomon* hold the same. *E.g., Hughes v. Nat'l Football League*, 2025 WL 1720295, at *2-3 (2d Cir. June 20, 2025) (summary order); *Salazar v. National Basketball Association*, 2025 WL 2830939, at *4-5 (S.D.N.Y Oct. 6, 2025); *Taino v. Bow Tie Cinemas, LLC*, 2025 WL 2652730, at *8 (S.D.N.Y. Sept. 16, 2025); *Golden v. NBCUniversal Media, LLC,* 2025 WL 2530689, at *7 (S.D.N.Y. Sept. 3, 2025); *Joiner v. NHL Enterprises, Inc.*, 2025 WL 2846431, Report & Recommendation at 11–15 (S.D.N.Y. Aug. 29, 2025), at *5-7; *Nixon v. Pond5, Inc.*, 2025 WL 2030303, at *4–6 (S.D.N.Y. July 21, 2025).

### A. Plaintiff Has Not Alleged That the Title of a Specific Video Was Disclosed

Plaintiff has not pled that any disclosures to Meta and Google would reveal to them the *specific* audiovisual material requested or obtained by Plaintiff, or any person. The VPPA was enacted to prevent the disclosure of a person's private video choices, in circumstances where the disclosure would easily identify the specific title of the video. *See* 1988 WL 170802 (May 10, 1988) ("[W]hat the law should not allow, is that a detailed list of their previous rentals - the titles of the films, the dates they were rented - will be disclosed to other[s]. . . .").

Plaintiff points to one video allegedly disclosed to Meta and Google as an example of the VPPA violation (not a video he watched). As to Google, he alleges that the title is "Conflict Resolution" and that the category is "CPE Learning." (Am. Compl. ¶ 20.) That speculative allegation ostensibly comes from the line of code labeled "dt" which states "Conflict Resolution | CPE Learning." *Id.* He provides no explanation about the distinction between title and "category" or what "category" even means in this context. For the alleged Meta disclosure, Plaintiff claims that the term "Conflict Resolution" is shared via a line of code "cd[pageFeatures]" (*Id.* ¶¶ 31, 32), and that "Conflict Resolution" is the title, but offers no explanation for why the alleged disclosure to Meta was different than the alleged disclosure to Google.

It's not clear how Plaintiff determined the title of the video—the code does not indicate the cited title is a video title, as opposed to any other page feature, such as page title. Even assuming Plaintiff has plausibly pled the correct title, Plaintiff does not allege how one would connect the title with the video on the Website. In *Rancourt v. Meredith Corp.*, the plaintiff alleged that a Google search including the video ID would reveal the specific video watched. 2024 WL 381344 at *2 (D. Mass. Feb. 1, 2024). Here, there is no such connecting allegation.

More critically, Plaintiff does not allege that Meta or Google understand that "Conflict Resolution" is the title of the video on the article page, as opposed to a reference to any other feature on the page. There is no allegation, for example, that Facebook interprets the one line of code prefaced by "cd[pageFeatures]:" to reference the title of a video on the page or even that Becker programmed that coding to reference videos. These failures are significant because under this Circuit's binding precedent in *Yershov*, for a disclosure to contain PII, it must be foreseeably likely to reveal which videos a person has obtained. 820 F.3d at 486. Revealing what *page* was visited is not enough. Here, Plaintiff has not alleged that this line of code reveals to Google and Meta specifically what videos a user watched.[3]

### B. Plaintiff Has Not Alleged That Becker Disclosed Information That Would Identify Him

Plaintiffs' VPPA claim fails for the independent reason that Plaintiff has not alleged that Google or Facebook received information that would likely or foreseeably identify *him*. Plaintiff pleads the existence of Google tools and cookies (most of which he alleges only fire when a user is logged into Google and also has Ads Personalization turned on) and then leaps to the allegation that Google identified Plaintiff, or was reasonably likely to. He does not allege facts, as *Yershov* requires, showing that Google, as recipient, could identify Plaintiff as a specific person tied to a specific video from what Becker disclosed. The allegation that "Google Signals was enabled" is not a factual allegation of a person-level identification by Google.

[3] Plaintiff's allegation that an "ordinary person" could decipher the title of the video from the code (*e.g.* Am. Compl. ¶ 34)—if that is even the video title—is highly implausible. For example, in *Taino v. Bow Tie Cinemas, LLC*, 2025 WL 2652730, at *8 (S.D.N.Y. Sept. 16, 2025), the court applied the "ordinary person" standard and observed that, although the code included the phrase "Venom-Let-There-Be-Carnage-Trailer-and-Info&rl," which plaintiff highlighted with red boxes to show it contained the movie's name, "it is implausible that an ordinary person would be able to interpret this code, without Plaintiff's emphases with red boxes, 'with little or no extra effort . . . .'" *Id.* (quoting *Solomon*, 136 F.4th at 54).

For example, Plaintiff alleges that an AUID is disclosed to Google, and cites a social media posting calling AUID a "unique pseudo-id for a user" (Am. Compl. ¶ 21). But a *pseudo* id is not an identifier that points to a person. The LinkedIn article Plaintiff cites[4] specifies that Google uses the "AUID" identifier to internally retrieve and match the user-provided data that was sent *earlier* (data such as email, phone, address, called "em" in the post). *Id.* Here, however, there are no allegations that any data was sent earlier. The "detective work" necessary to connect this data to a person is precisely what *Yershov* found inadequate to qualify this type of data as PII.

Further, the types of cookies Plaintiff alleges are disclosed are not enough for Google to identify an individual user and the video he or she watched, as made clear from a review of Google's own policies and support pages that Plaintiff repeatedly cites in the Complaint. Those policies state that Google Analytics, for example, is meant to "report site usage statistics" to businesses "*without personally identifying individual visitors.*"[5] The "_ga cookie" that Plaintiff alleges Defendant discloses to Google allows Google to "distinguish one visitor from another," but that does not mean that it allows Google to identify a *specific* person. In fact, the policy site says: "Each '_ga' cookie is unique to the specific property, so it cannot be used to track a given user or browser across unrelated websites." *Id.*

---

[4] Am. Compl. n.29 (citing https://www.linkedin.com/pulse/one-reasons-why-google-ads-conversion-tags-gtm-failed-giovani-ftghf).

[5] *See* Google, How Google Uses Cookies, https://policies.google.com/technologies/cookies?hl=en-GB (last visited Nov. 19, 2025) (emphasis added). This Court may consider this site on this Motion in the interest of completeness because Plaintiff cited numerous other explanatory support pages relating to cookies from Google's corporate domain. *See, e.g., Tassinari v. Salvation Army Nat'l Corp.*, 610 F.Supp.3d 343, 360 n.14 (D. Mass. 2022) (complaint repeatedly cited portion of website so other pages incorporated by reference).

There are no allegations that Becker has disclosed any other types of information that would identify Garcia. In other VPPA cases that survived a motion to dismiss in this Circuit, plaintiff pled that the defendant disclosed geolocation information on its own (or with other data), which was sufficient to constitute PII. In *Yershov*, the First Circuit determined that alleged disclosure of GPS coordinates of the phone's location at the time the videos were watched were enough to "enable most people to identify" the "likely" home and work addresses of the viewer . . . ." 820 F.3d at 486. Later cases are in accord. *E.g. Louth v. NFL Enters. LLC*, 2022 WL 4130866, at *3 (D.R.I. Sept. 12, 2022) (plaintiff "buttresse[d] his assertion that geolocation and AAID are PII with argument that the combination of the two allows Google to identify specific users . . . ."); *Rancourt*, 2024 WL 381344 at *16 (alleging that GPS location that determined a meaningful location was disclosed).[6] Here, Plaintiff alleges *nothing* about geolocation information—nor any other type of identifying information whatsoever.

Regarding Meta, Plaintiff alleges that two pieces of information that identify him are disclosed; these fare no better. The first is a browser ID, and Plaintiff admits that it simply identifies a browser, not a person. (Am. Compl. ¶ 34.) Plaintiff alleges that the "the browser ID value, along with other 'customer information parameters[,]' is ultimately 'matched to Meta accounts.'" *Id.* The cited website explains that a browser is of "medium value" in helping Meta

---

[6] Notably, in *Therrien v. Hearst*, 2025 WL 1208535 (D. Mass. April 25, 2025), on a summary judgment motion, the court found that the geolocation data was *still* not enough to identify the person since it revealed a public location. Further, the unique customer ID disclosed was also not enough because it was only linked to a device, not a person. Nor was an email address enough since there was no evidence that defendant could link the address to plaintiff. *Id.*

match the data to a Facebook user.[7] No allegations clarify how this information is "matched," and there are no allegations a Facebook ID is disclosed.

Plaintiff alleges that a hashed phone number is disclosed to Meta, but that does not help him. He does not sufficiently allege that Meta foreseeably uses that hashed number to identify a person, and that the hashed phone parameter and specific video title were sent together in the same event to Meta in a way that would identify a person as having obtained specific video materials. (Am. Compl. ¶ 35). He claims that Meta states that it can use hashed information and compare it to its own hashed information to build custom audiences. (*Id.* ¶ 37, n.56). The page cited[8] states that hashing "turns the information in your customer list into randomized code. The process cannot be reversed." That page does not specify that hashed phone numbers specifically are part of any hashed information Meta has on hand associated with an individual. *Id.* Plaintiff cites the FTC as stating that hashing is an insufficient method to anonymize information because it can be decoded and traceable to individuals. (*Id.* ¶ 37, n.54.) But there are no allegations that Meta actually decodes the hashed phone number and identifies it with individuals. Separately, that a hashed phone number can be decoded does not mean that Meta is foreseeably likely to use it to identify an individual, as *Yershov* requires.

---

[7] Am. Compl. ¶ 34 n.48, (citing https://www.facebook.com/business/help/765081237991954?id=818859032317965).

[8] Am. Compl. ¶ 37 n.56 (citing https://www.facebook.com/business/help/112061095610075?id=2469097953376494).

## CONCLUSION

For the foregoing reasons, Defendant Becker Professional Development Corporation respectfully requests that this Court dismiss Plaintiff's Amended Complaint, in its entirety, with prejudice.

Dated: November 19, 2025

Respectfully submitted,

BECKER PROFESSIONAL
DEVELOPMENT CORPORATION

By its attorneys,

/s/ *Tony K. Lu*
Tony K. Lu (BBO# 678791)
DENTONS US LLP
101 Federal Street
Suite 1900
Boston, Massachusetts 02110
Tel: (617) 235-6817
Email: tony.lu@dentons.com

Kristen C. Rodriguez (*admitted pro hac vice*)
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Tel: (212) 768-6700
Email: kristen.rodriguez@dentons.com

Lyndsey M. Wajert (*admitted pro hac vice*)
DENTONS US LLP
233 South Wacker Drive
Suite 5900
Chicago, IL 60606
Tel: (312) 876-8000
Email: lyndsey.wajert@dentons.com

**CERTIFICATE OF SERVICE**

I certify that on November 19, 2025, I caused to be filed electronically a true copy of the foregoing document with the Clerk of the Court using the CM/ECF system, which will notify the parties of record via electronic notification.

/s/ *Tony K. Lu*