**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MICHAEL GARCIA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BECKER PROFESSIONAL DEVELOPMENT CORPORATION,<br><br>Defendant. | Case No. 1:25-cv-12157-JEK<br><br>Hon. Julia E. Kobick |

# PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Dated: December 17, 2025

**BURSOR & FISHER, P.A.**
Yitzchak Kopel (BBO #716245)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com

*Attorney for Plaintiff*

**TABLE OF CONTENTS**

INTRODUCTION ..... 1

ARGUMENT ..... 2

I. THE COURT HAS SPECIFIC JURISDICTION OVER BECKER ..... 2

A. The Massachusetts Long Arm Statute is Satisfied ..... 2

1. Becker Transacts Business in Massachusetts ..... 2

2. Becker Contracts To Supply Services In Massachusetts ..... 4

3. Becker Caused Tortious Injury In Massachusetts And Derives Substantial Revenue From Massachusetts ..... 5

B. The Due Process Clause is Satisfied ..... 7

1. Defendant Purposefully Availed Itself Of The Privilege Of Doing Business In Massachusetts ..... 7

2. Plaintiff's Claims Are Related To Becker's Massachusetts-Based Conduct ..... 10

3. Exercising Jurisdiction Over Becker Is Reasonable ..... 12

II. PLAINTIFF STATES A CLAIM UNDER THE VPPA ..... 13

A. Plaintiff Alleges His Video Viewing Information Was Disclosed ..... 13

1. Defendant Disclosed the Subject Matter Of The Videos ..... 13

2. Defendant Disclosed The Specific Videos Requested ..... 14

B. Plaintiff's Personally Identifiable Information Was Disclosed ..... 16

CONCLUSION ..... 20

## TABLE OF AUTHORITIES

PAGE(S)

**CASES**

*Adams v. America's Test Kitchen*, LP,
680 F. Supp. 3d 31 (D. Mass. 2023) ... 2, 15

*Ambrose v. Boston Globe Media Partners LLC*,
2022 WL 4329373 ... 2, 18

*Briskin v. Shopify, Inc.*,
135 F.4th 739 (9th Cir. 2025) ... 2, 10, 11

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) ... 13

*Cappello v. Rest. Depot, LLC*,
89 F.4th 238 (1st Cir. 2023) ... 11

*Czarnionka v. Epoch Time Assoc., Inc.*,
2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022) ... 18

*Egan v. X-Mode Social Inc.*,
2024 WL 2701967 (D. Mass. May 24, 2024) ... 11

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ... 16, 18

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
592 U.S. 351 (2021) ... 12

*Frawley v. Nexstar Media Grp., Inc.*,
2023 WL 6065768 (D. Mass. Sept. 18, 2023) ... 7

*Golden v. NBCUniversal Media, LLC*,
688 F. Supp. 3d 150 (S.D.N.Y. 2023) ... 13, 15

*Grice v. VIM Holdings Group, LLC*,
280 F. Supp. 3d 258 (D. Mass. 2017) ... 12

*Healey v. Hydraforce, Inc.*,
2005 WL 1009514 (Mass. Super. Ct. Mar. 18, 2005) ... 5

*In re Hulu Priv. Litig.*,
86 F. Supp. 3d 1090 (N.D. Cal. 2015)....................15

*In re Nickelodeon Consumer Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016)....................17

*In re TelexFree Sec. Litig.*,
626 F. Supp. 3d 253 (D. Mass. 2022)....................4, 5

*In re Zynga Priv. Litig.*,
750 F.3d 1098, 1101 (9th Cir. 2014)....................15

*Kahoot! AS v. CPDLive Pty Ltd.*,
2025 WL 2785102 (D. Mass. Sept. 30, 2025)....................3

*Keds Corp. v. Renee Int'l Trading Corp.*,
888 F.2d 215 (1st Cir. 1989)....................6

*Keeton v. Hustler Magazine, Inc.*,
465 U.S. 770 (1984)....................6

*Knox v. MetalForming, Inc.*,
914 F.3d 685 (1st Cir. 2019)....................7

*Kuan Chen v. United States Sports Acad., Inc.*,
956 F.3d 45 (1st Cir. 2020)....................8

*Lionetta v. InMarket Media, LLC*,
--- F. Supp. 3d----, 2025 WL 2533787 (D. Mass. Sept. 3, 2025)....................*Passim*

*Optos, Inc. v. Topcon Med. Sys., Inc.*,
777 F. Supp. 2d 217 (D. Mass. 2011)....................12

*Ouellette v. True Penny People, LLC*,
352 F. Supp. 3d 144 (D. Mass. 2018)....................4

*Pettengill v. Curtis*,
584 F. Supp. 2d 348 (D. Mass. 2008)....................6

*Plixer Int'l, Inc. v. Scrutinizer GmbH*,
905 F.3d 1 (1st Cir. 2018)....................8, 9, 10

*Power v. Connectweb Techs., Inc.*,
648 F. Supp. 3d 302 (D. Mass. 2023)....................9

*Power v. Connectweb Techs., Inc.*,
648 F. Supp. 3d 321 (D. Mass. 2023) ........................................ 10

*Pritzker v. Yari*,
42 F.3d 53 (1st Cir. 1994) ........................................ 12

*Rancourt v. Meredith Corp.*,
2024 WL 381344 (D. Mass. Feb. 1, 2024) ........................................ *Passim*

*Robinson v. Disney Online*,
152 F. Supp. 3d 176 (S.D.N.Y. 2015) ........................................ 17

*Stark v. Patreon, Inc.*,
635 F. Supp. 3d 841 (N.D. Cal. 2022) ........................................ 16, 18

*United States v. Gordon*,
954 F.3d 315 (1st Cir. 2020) ........................................ 20

*User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) ........................................ 15

*Yershov v. Gannett Satellite Information Network, Inc.*,
820 F.3d 482 (1st Cir. 2016) ........................................ *Passim*

**STATUTES**

18 U.S.C. § 2710 ........................................ *Passim*

Mass. Gen. Laws Ann. ch. 223A, § 3(b) ........................................ 2, 4, 5, 6

**OTHER AUTHORITIES**

S. Rep. No. 100-599 ........................................ 1, 14, 20

Plaintiff Michael Garcia ("Plaintiff") respectfully submits this opposition to Defendant Becker Professional Development Corp.'s ("Becker" or "Defendant") Motion to Dismiss (ECF No. 21) (the "Motion" or "MTD").

**INTRODUCTION**

By passing the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), Congress sought to "preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials." S. Rep. No. 100-599, at 1. To that end, Congress "created a civil remedy against a 'video tape service provider' for 'knowingly disclosing, to any person, personally identifiable information concerning any consumer of such provider.'" *Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 482, 485 (1st Cir. 2016) (quoting 18 U.S.C. § 2710(b)(1)). Defendant Becker is one such "video tape service provider." FAC ¶¶ 11-13.

Yet Becker did precisely that. Becker intentionally installed tracking technologies on its website. Becker knowingly disclosed Plaintiff's and putative Class Members' personally identifiable information and video-viewing information to Google and Meta. FAC ¶¶ 14-37. Even more troubling, Becker "admits" it did so for advertising and analytics purposes, *id.* ¶ 63, and to "build a profile ... and show [users] ... ads[,]" despite the "considerable sums" users already pay Becker to view its videos, *id.* ¶ 11. Becker lacks any credible defense and must appear in Boston to answer for its violation of the VPPA. Becker argues it is exempt from the reach of the Commonwealth's courts, but just this year the Court found jurisdiction over an out-of-state corporation where it collected and sold Massachusetts' residents data. *Lionetta v. InMarket Media, LLC*, --- F. Supp. 3d ---, 2025 WL 2533787 (D. Mass. Sept. 3, 2025) (Kobick, J.) (citing *Rancourt v. Meredith Corp.*, 2024 WL 381344 (D. Mass. Feb. 1, 2024)). And several courts—including three in this Circuit—dealing with similar sets of facts have rejected every substantive argument

Becker puts forth here. *See generally*, *e.g.*, *Yershov*, 820 F.3d 482; *Adams v. America's Test Kitchen*, LP, 680 F. Supp. 3d 31 (D. Mass. 2023); *Ambrose v. Boston Globe Media Partners LLC*, 2022 WL 4329373, at (D. Mass. Sept. 19, 2022). This Court should do the same.

## ARGUMENT

### I. THE COURT HAS SPECIFIC JURISDICTION OVER BECKER

Becker argues that Plaintiff cannot establish that specific jurisdiction "is permitted by the Long-Arm Statute and … comports with the Due Process Clause of the Fourteenth Amendment." MTD at 7. Effectively, Becker takes the position that despite its Massachusetts-specific offerings and resources, its reaping substantial revenue from Massachusetts, and its hundreds of Massachusetts users, Becker is "jurisdictionally nowhere except in its principal place of business and state of incorporation." *Briskin v. Shopify, Inc.*, 135 F.4th 739, 757 (9th Cir. 2025). This argument is untenable and has been rejected by "the Supreme Court." *Id.*

#### A. The Massachusetts Long Arm Statute is Satisfied

As relevant here, the Massachusetts long-arm statute provides that "[a] court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's":

> [a] transacting any business in this commonwealth; [b] contracting to supply services or things in this commonwealth; [*or*] … [d] causing tortious injury in this commonwealth by an act or omission outside this commonwealth *if* he regularly does or solicits business, *or* engages in any other persistent course of conduct, *or* derives substantial revenue from goods used or consumed or services rendered, in this commonwealth[.]

Mass. Gen. L. ch. 223A, § 3 (emphasis added). Plaintiff's allegations satisfy each of these prongs.

##### *1. Becker Transacts Business in Massachusetts*

Becker argues "there is no connection between any Website operations and Massachusetts" and that Plaintiff "cannot plausibly plead facts establishing the required 'but-for' causation." MTD

at 8. Not so. *Kahoot! AS v. CPDLive Pty Ltd.*, 2025 WL 2785102 (D. Mass. Sept. 30, 2025), is on point. There, the defendant was a "foreign corporation" that provid[ed] online products and services to the education market." *Id.*, at *1. The court found "specific personal jurisdiction over [d]efendant based on [d]efendant's trademark-building activities in Massachusetts." *Id.* Specifically:

> [defendant's] business contacts include a partnership with the Massachusetts Institute of Technology ("MIT") to offer professional certificate programs … Defendant continues to prominently feature MIT and other Massachusetts-based clients through testimonials on its website. … By specifically highlighting this Massachusetts-based business, Defendant reinforces the brand-building import of its Commonwealth contacts and prospectively targets its behavior toward the Massachusetts economy, satisfying purposeful availment.

*Id.* (cleaned up). The same holds true here. Similar to how the *Kahoot!* defendant partnered with MIT to offer professional certificate programs, Becker entered "arrangements with various Massachusetts entities—including public universities" to offer its services. FAC ¶ 85. And Becker partnered with the "Massachusetts Society of CPAs" to, in Becker's own words, "support their members' professional development needs and to offer special pricing on Becker's CPA Exam Review." FAC ¶ 83 (cleaned up).

Becker argues "but-for cause'" is not met because "partnering with local organizations has no nexus to whether a user accesses course materials that contain videos." MTD at 8; *see also* MTD at 3. But Plaintiff alleges that Becker's arrangements "are designed to, *inter alia*, 'bill' Massachusetts entities for offerings to individual Website users relating to Becker's 'CPA, CMA, CIA or EA Exam or [] CPE credits with Becker.'" FAC ¶ 85 (cleaned up). In other words, Becker's arrangements with Massachusetts entities are designed to provide Massachusetts' users with a means to access paid course materials—including the pre-recorded videos "at issue" in this case—

out of which Plaintiff's VPPA suit arises. *Id.*; *see also id.* ¶ 11.

Citing zero case law, Becker also argues that "Plaintiff does not allege that *he* subscribed to Becker's offerings through any Massachusetts associations, universities, or other partnerships." MTD at 3 (emphasis added). This is a red herring. "In deciding whether a claim 'aris[es] from' a defendant's relevant conduct, courts assess whether the *defendant's* relevant conduct"—not Plaintiff's—"was a 'but for' cause of the plaintiff's alleged harm." *In re TelexFree Sec. Litig.*, 626 F. Supp. 3d 253, 281 (D. Mass. 2022) (emphasis added). "Here, [Becker]'s conduct easily satisfies the 'but for' causation standard. Plaintiff's claims arise directly from [Becker]'s transaction of business in the Commonwealth." *Ouellette v. True Penny People, LLC*, 352 F. Supp. 3d 144, 151 (D. Mass. 2018). More importantly, Plaintiff's purchase of video materials from Becker using his Massachusetts billing information "w[as] the first step in the train of events resulting to his alleged [privacy] harms." *Id.* at 151-52. And "[t]he facts put forward show that [Becker] has transacted substantial business in the Commonwealth"—selling its online materials—"out of which the [privacy] rights at issue … arise." *Kahoot!*, at *5; *see* FAC ¶¶ 80-85.

*2. Becker Contracts To Supply Services In Massachusetts*

Mass. Gen. Laws Ann. ch. 223A, § 3(b) also provides for personal jurisdiction because Becker contracted with Plaintiff "to supply services … in this commonwealth." Defendant does not address subsection (b) at all in its brief. *See generally* MTD.

*In re TelexFree* is instructive. In that case, a defendant was "hired … to provide advice" to a "Massachusetts-based entity." *In re TelexFree*, 626 F. Supp. 3d at 281. "Even though [the defendant] was located outside Massachusetts when it rendered this advice, [the defendant] in effect delivered this advice to Massachusetts, for use in Massachusetts." *Id*. "[A]s the consulting agreement exemplifies, [the defendant] contracted to supply services in Massachusetts." *Id.* (cleaned up).

Here, Becker does not refute it is a video tape *service* provider. FAC ¶¶ 11-13. And the VPPA prohibits "[a] video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). Becker contracts to provide video services to consumers. *See*, *e.g.*, FAC ¶ 11 ("Becker provides its subscribers…"); *id.* ¶ 11 n.7 ("'Prime'" for $799; 'Prime (2-year)' for $1,429"). "It is plausible that, but for" Plaintiff's involvement with Defendant's video services, Plaintiff "would not have suffered [the privacy violation]. Thus, [Defendant] is subject to personal jurisdiction under the Massachusetts long-arm statute." *In re TelexFree*, 626 F. Supp. 3d at 281.

*3. Becker Caused Tortious Injury In Massachusetts And Derives Substantial Revenue From Massachusetts*

The Court also has personal jurisdiction over Becker pursuant to "[s]ection 3(d) of the Long-Arm Statute." MTD at 10. To this end, *Rancourt v. Meredith Corp.*, 2024 WL 381344 (D. Mass. Feb. 1, 2024) is instructive. In *Rancourt*, a Massachusetts plaintiff brought a VPPA claim against an Iowa corporation, 2024 WL 381344, at *1, and the court found jurisdiction was proper pursuant to § 3(d). *Id.*, at *1, *5. Noting that "[s]ection 3(d) is to be construed extremely broadly," the court found that "Meredith's nearly $70,000 in ad revenue from devices located in Massachusetts over two years meets this requirement." *Id.*, at *5-6; *see also Healey v. Hydraforce, Inc.*, 2005 WL 1009514, at *1 (Mass. Super. Ct. Mar. 18, 2005) ("Cases construing § 3(d) demonstrate that the [several hundred thousand dollars in] … revenue which [defendant] derived, directly and indirectly, from sales of goods in the Commonwealth substantially surpass any minimum requirement.").

So too here. Becker concedes that "2.1% of its overall revenue [came] from Massachusetts in 2024," and that between 2.4%-2.6% of its users purchased course materials in Massachusetts. Brown Decl. ¶¶ 8-9. The Supreme Court has characterized sales of less than one percent to be a

"substantial number." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984). Indeed, the First Circuit found "[t]he sale of 6000 pairs of shoes for $15,000 [to] easily meet[] this requirement." *Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 219 (1st Cir. 1989) And Plaintiff was injured in Massachusetts, because that is where his PII was disclosed without his consent. FAC ¶¶ 6, 66-73, 78. Accordingly, § 3(d) is also satisfied.

Becker protests, arguing that "Plaintiff [] cannot rely on [§] 3(d) … which only applies if general jurisdiction exists." MTD at 10. But the Massachusetts long-arm statute is distinct from the Due Process Clause. *See Keds Corp.*, 888 F.2d at 218 ("[§ 3(d)] requires an act *outside* of the commonwealth … that causes injury (infringement) *within* the commonwealth.") (emphasis added). Accordingly, "general personal jurisdiction" for the Massachusetts long-arm statute is different than that of the Due Process Clause. The two concepts have to be distinct because if Becker were headquartered or incorporated here (*i.e.*, if the Court possessed general personal jurisdiction over Becker), then there would be no need for a jurisdictional analysis. *See Rancourt*, 2024 WL 381344, at *5-6 (finding jurisdiction under § 3(d) even though, for Due Process analysis, "Mr. Rancourt argues only that the Court has specific personal jurisdiction"). And, as the First Circuit has made clear, a certain sales threshold is sufficient to satisfy § 3(d), regardless of whether they would constitute "general personal jurisdiction" under the Due Process Clause. *See Keds Corp.*, 888 F.2d at 219.

Finally, Becker's authorities are unpersuasive. In *Pettengill v. Curtis*, 584 F. Supp. 2d 348 (D. Mass. 2008), the plaintiff's theory was that several defendants failed to act at a national level to prevent sexual abuse by scoutmasters in Massachusetts. *See id.* at 358. Thus, the court held "Pettengill attempts to transform a failure to act that was directed nowhere in particular into a purposeful availment of the laws of one specific state, Massachusetts." *Id.* at 358-59. By contrast,

Plaintiff alleges that Becker took affirmative acts to avail itself of Massachusetts, including Massachusetts-specific course offerings and material, and knowingly derived substantial revenue from Massachusetts residents.

In *Frawley v. Nexstar Media Grp., Inc.*, 2023 WL 6065768, at *4 (D. Mass. Sept. 18, 2023), the court found that the defendant did not "solicit[] Massachusetts citizens more than citizens of any other state."In *Frawley*, the defendant's "revenue in Massachusetts" was derived from "business activities" that had nothing to do with "the newsletter at issue" in that case. *Id.*, at *4 ("None of the … employees and none of the real estate owned ... *are related in any way* to the operations of [the newsletter].") (emphasis added). Here, however, Becker conceded that its Massachusetts-derived revenue comes from "course materials" and videos, MTD at 2, which are the subject of the present lawsuit, *see generally* FAC. Moreover, "the question is not whether a defendant sells its product across the U.S.; it is instead whether a defendant's forum connection is such that the exercise of jurisdiction is essentially voluntary and foreseeable." *Knox v. MetalForming, Inc.*, 914 F.3d 685, 692 (1st Cir. 2019) (cleaned up) (rejecting argument that the court "should discount [defendant's] Massachusetts sales because those sales were part of a nationwide sales effort"). And here, Becker has taken "a voluntary act to foster the regular flow or regular course of sales in the Commonwealth" (*Rancourt*, 2024 WL 381344, at *9 (cleaned up)) by, *inter alia*, providing Massachusetts-specific offerings and resources, having Massachusetts-specific representatives, and partnering with Massachusetts-specific institutions. FAC ¶¶ 80-85.

In sum, §§ 3(a), 3(b), and 3(d) of the Massachusetts long-arm statute are satisfied.

### B. The Due Process Clause is Satisfied

#### *1. Defendant Purposefully Availed Itself Of The Privilege Of Doing Business In Massachusetts*

Becker is wrong to argue that its contacts with Massachusetts do not meet the purposeful availment prong. MTD at 10-12. "In the analogous context of a website, the First Circuit has explained that a plaintiff must 'show that the website either specifically targets the forum **or** has resulted in the defendant's knowing receipt of substantial revenue from forum residents.'" *Lionetta*, 2025 WL 2533787 (Kobick, J.) (emphasis added) (quoting *Kuan Chen v. United States Sports Acad., Inc.*, 956 F.3d 45, 60 (1st Cir. 2020)). And here, Plaintiff has shown both.

*First*, Becker's website specifically targets Massachusetts. "[T]he relevant question is whether [defendant] 'deliberately used' its software in the applications 'to target' the plaintiffs while they were in Massachusetts." *Id.*, at *4 (internal citation omitted). Indeed, this Court held a defendant "purposefully availed itself of the Massachusetts market," where, *inter alia*, it "allegedly [] embedded its software in third-party applications knowing that it would obtain geolocation data from consumers in Massachusetts, and … allegedly used and sold that data to target those same Massachusetts consumers." *Id.*, at *5. "Reflecting its 'intent to serve the forum,' [defendant] 'knew that it was serving [Massachusetts] customers and took no steps to limit its [software's] reach or block its use by [those] customers.'" *Id.* (citing *Plixer Int'l, Inc. v. Scrutinizer GmbH,* 905 F.3d 1, 9 (1st Cir. 2018)).

This case is no different. The FAC alleges Becker "intentionally and knowingly integrated the foregoing trackers (the Meta Pixel, as well as Google Analytics, Google Conversion Linker, Google Signals, and Google's tags/libraries associated therewith) into the HTML documents and/or other libraries defining the contents of [its] Website." FAC ¶ 64. "Defendant knows where users of its Website are located based on users' IP addresses and knowingly discloses user information to third parties." FAC ¶ 86 (citation omitted); *see also* FAC ¶ 78 ("Defendant purposefully avails itself of the benefits of this District by selling subscriptions to persons whom

Defendant knows to reside in this District (based on billing information provided to Defendant at checkout).”). Finally, Becker has taken zero steps to limit the trackers’ reach. *See generally* MTD.

Even if Becker did not specifically target the Commonwealth (it did), the website nonetheless resulted in knowing receipt of substantial revenue from Massachusetts residents. Case law on this issue overwhelmingly favors Plaintiff, despite Becker’s limited, cherry-picked revenue figures that fail to paint the full revenue picture. *See* MTD at 12.

For example, in *Plixer Int’l, Inc.*, the court had personal jurisdiction where “the record [] show[s] that [defendant] used its website to obtain U.S. customer contracts[ which] … yielded nearly $200,000 in business over three-and-a-half years. This is not a situation where a defendant merely made a website accessible in the forum. … This holding accords with Supreme Court precedent.” 905 F.3d at 10. And in *Rancourt*, the court found purposeful availment where “over two years … Meredith earned over $66,000 or 2% of the App's total U.S. ad revenue from Massachusetts devices. Courts have held business of a similar magnitude to be sufficiently substantial for personal jurisdiction.” 2024 WL 381344, at *8 (cleaned up) (collecting cases). Finally, in *Power v. Connectweb Techs., Inc.*, 648 F. Supp. 3d 302, 318 (D. Mass. 2023), the “[defendant]’s use of its website to conduct a substantial amount of sales of its products in Massachusetts is sufficient to demonstrate the existence of something ‘more’” where “the record demonstrates … that since about 2016, the defendant ‘has sold products to at least 7,400 customers in Massachusetts totaling more than $345,000.00 in sales.” “According to [defendant], its sales in Massachusetts were comparable to sales in states with similar population sizes, but it does not claim that its sales in Massachusetts were inconsequential.” *Id.* at 319.

Here, Becker concedes: “Massachusetts accounts for [] 2.1% of Becker’s 2024 revenue, with roughly 2.5% of users listing Massachusetts addresses across the past three years.” MTD at

12 (citation omitted). Nowhere in its brief does Becker contend these figures are "inconsequential." *See generally* MTD. Nor could it—Becker's subscribers "pay considerable sums" for their courses, FAC ¶ 11, with CPA courses alone running subscribers between $2,499 and $5,349. *Id.* n.7. The Brown Declaration further concedes that "[i]n 2023, **666** users purchased course materials from Becker and provided a billing or shipping address in Massachusetts .... In 2024, that figure was **734**, ... As of August 2025, that figure was **588**...." Brown Decl. ¶ 9 (emphasis added). Thus, over the past three (3) years, Defendant sold **1,988** subscriptions in Massachusetts.. Assuming each user paid $1,000, that amounts to $1,988,000 in revenue.

Becker argues "[t]hose figures underscore a national footprint with minimal forum engagement …." MTD at 12. But, according to the First Circuit, "[t]his is not a situation where [Becker] merely made [its] website accessible in the forum." *Plixer Int'l, Inc.*, 905 F.3d at 10.

Becker cites *Power v. Connectweb Techs., Inc.*, 648 F. Supp. 3d 321, 337 (D. Mass. 2023), which is readily distinguishable. Unlike that case where the "[plaintiff] has not presented anything more than the unverified allegations of his complaint to support an assertion of purposeful availment [and] … [t]he record … demonstrates that [defendant] does not target its advertising to Massachusetts and derives no significant revenue from customers in this state[,]" here, to the contrary, Becker both (1) knew it was serving Massachusetts customers and took no steps to limit the tracking technologies' reach; and (2) derives substantial revenue from Massachusetts residents.

### 2. *Plaintiff's Claims Are Related To Becker's Massachusetts-Based Conduct*

Next, Defendant argues that "Plaintiff … summarily claims" relatedness. MTD at 12. Specifically, Defendant contends that "Plaintiff does not plead that the alleged violation … is tied to any act or omission *in Massachusetts*...." MTD at 13. But this argument was squarely rejected by *Lionetta*, 2025 WL 2533787, at *3 (citing *Briskin v. Shopify, Inc.*, 135 F.4th 739, 760 (9th Cir.

2025) (en banc) (finding relatedness because defendant's "installation of software onto unsuspecting Californians' devices and extracting personal data from them is the kind of contact that would tend to cause privacy injuries")).

"To demonstrate relatedness ... plaintiff[] 'must show a nexus between [those] claim[s] and [defendant's] forum-based activities.'" *Id.* (citing *Cappello v. Rest. Depot, LLC*, 89 F.4th 238, 245 (1st Cir. 2023)). In *Lionetta*, for example, "[t]he plaintiffs' claims [] arise out of [defendant]'s contact with the plaintiffs' Massachusetts-based devices, which contain apps embedded with [the defendant software] SDK, and [defendant] earns revenue from retailers who buy advertisements precisely because they can target Massachusetts consumers more likely to shop in their Massachusetts-based stores." *Id.*, at *3 (citing *Briskin*, 135 F.4th at 760).

Here, as in *Lionetta*, Plaintiff's claims "arise out of" Becker's contact with his device, which Becker knew was in Massachusetts. "Defendant obtained valuable personal data about Massachusetts consumers for its own commercial gain. ... Defendant knows where users of its Website are located based on users' IP addresses and knowingly discloses user information to third parties. Through those business activities, Defendant tortiously violated Plaintiff's privacy through its collection, maintenance, and/or sale of valuable personal data from Massachusetts consumers." FAC ¶ 86. Plaintiff "ha[s] established that [his] claims arise out of, or relate to, [Becker's] activities in Massachusetts." *Lionetta*, 2025 WL 2533787, at *3.

Becker's argument relies on *Egan v. X-Mode Social Inc.*, 2024 WL 2701967 (D. Mass. May 24, 2024), MTD at 13, but this Court already held "[t]his case is more akin to *Rancourt*" than *Egan* because Becker is not merely "harvesting" data. *Lionetta* 2025 WL 2533787, at *3. "Instead, "Becker transmits [Plaintiff's] ... PII and video-viewing information to Google and Meta so that Google and Meta can help [Becker] launch marketing campaigns, target [Plaintiff and

Massachusetts users] with advertising, and analyze Website [Massachusetts] user data." FAC ¶ 38. "On these facts, there is a strong 'relationship among the defendant, the forum, and the litigation'— the 'essential foundation' of specific jurisdiction." *Lionetta*, 2025 WL 2533787, at *3 (cleaned up) (citing *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 365 (2021).

*3. Exercising Jurisdiction Over Becker Is Reasonable*

Because the first two elements of Due Process are satisfied, Becker "bears the burden of proof to show unfairness" of exercising jurisdiction over it in Massachusetts. *Grice v. VIM Holdings Group, LLC*, 280 F. Supp. 3d 258, 274 (D. Mass. 2017). To determine reasonableness, the Court evaluates the five "*Gestalt* factors":

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

*Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir. 1994) (citation omitted). Becker does not even come close to meeting its burden here.

Becker's argument that it "does not have employees in this state who can *testify*" has been squarely rejected. MTD at 13 (emphasis added). "[R]equiring a [Delaware] company that does business in Massachusetts to appear in Massachusetts courts 'is not an overwhelming burden.'" *Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217 (D. Mass. 2011) (citation omitted). "In the modern era, the need to travel between *New York and Puerto Rico* creates no especially ponderous burden" and does not trigger the first factor. *Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir. 1994) (emphasis added); *see also Lionetta*, 2025 WL 2533787, at *5; *Rancourt*, 2024 WL 381344, at *11. In any event, Becker admits "four [employees] reside in Massachusetts." MTD at 2.

As to the second factor, Becker concedes that "Massachusetts has an interest in protecting

the rights of its citizens," but argues that "this case does not raise any novel issues that would impact Massachusetts law." MTD at 13. This is insufficient alone to meet its burden. MTD at 13. Massachusetts "has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Lionetta*, 2025 WL 2533787, at *5 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985)). Massachusetts is where Plaintiff accessed the Becker website and where his PII and video-viewing information was disclosed by Becker to third parties. FAC ¶¶ 66, 86.

"Third, some deference is owed to the plaintiff['s] choice of forum, ... and it would be most convenient for [] plaintiff[] to litigate this matter in Massachusetts, where [he] ... reside[s]." *Id.* (internal citation omitted). Becker does not address the fourth factor, and the court may "[a]ssum[e] th[at] factor[] weigh[s] in favor of neither party..." *Id.*, at *5. Fifth, as noted above, Becker knowingly targeted and derived substantial revenue from Massachusetts-based users based, at least in part, on the disclosure of Massachusetts users' PII. Argument § I.B.1, *supra*. It is not unreasonable to exercise jurisdiction over Becker in these circumstances.

## II. PLAINTIFF STATES A CLAIM UNDER THE VPPA

### A. Plaintiff Alleges His Video Viewing Information Was Disclosed

#### *1. Defendant Disclosed the Subject Matter Of The Videos*

Becker argues "[t]he VPPA was enacted to prevent the disclosure of a person's private video choices, … where the disclosure would [] identify the specific title of the video[,]" and Plaintiff has not alleged as much. MTD at 15 (citation omitted). This argument fails out of the gate because a showing that Becker disclosed the "subject matter" of a video alone is sufficient for a violation. *See Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 160 n.10 (S.D.N.Y. 2023) (complaint stated a claim "regardless whether the 'title' of the viewed videos were disclosed" because "the disclosure of the URL identifies the subject matter of the viewed video.").

This is also evinced by the VPPA's legislative history, which states that "[d]isclosure of subject matter [of the videos] may be made only in instances where communications are sent directly to the consumer. Some video tape service providers sell limited types of videos. … The disclosure of the customer lists of those providers indirectly would disclose the subject matter of the video." S. Rep. 100-599 at 13. This is further reinforced by the statutory language that permits consumers' "name[] and address[]" to be disclosed *if* "the disclosure does not identify the title, description, **or subject matter** of any video tapes or other audio visual material." 18 U.S.C. § 2710(b)(2)(D)(ii) (emphasis added). There would be no need to reference the video's subject matter in the exception if the disclosure was otherwise already permitted.

Here, Becker discloses to Google the "category of the video[, such as] 'CPE [(Continuing Professional Education)] Learning." FAC ¶ 20; *see also* ¶ 4.[1] And because Becker exclusively displays videos relating to "exam review and CPE learning[,]" the disclosure of the subject matter of these videos to Google and Meta—even when divorced from the specific video title—would violate the statute. *Id.* ¶ 5.

*2. Defendant Disclosed The Specific Videos Requested*

Plaintiff has also alleged the video viewing information Becker disclosed by to Google and Meta is "reasonably and foreseeably likely" to reveal which specific videos were watched by consumers. *Yershov*, 820 F.3d at 486. Plaintiff alleges that Becker discloses to Google "the title and URL of the video[,]" FAC ¶¶ 19, 20, and Becker discloses to Meta "title and URL of the video the user is watching, along with video interactions[,]" such as "'Play[,]' 'Play course[,]' and

[1] Becker argues Plaintiff "provides no explanation about the distinction between title and 'category' or what 'category' [] means." MTD at 15. This is false. In the FAC's example, "the category of the video was 'CPE Learning[,]'" and "the title of the video was 'Conflict Resolution.'" FAC ¶ 20. The former refers to the subject grouping under which Becker offers a video—e.g., "CPA" or "CPE." *Id.* ¶ 4. The latter refers to the name of the individual video watched.

'Resume[,]' showing that a user clicked on buttons to play and resume the video[,]" *Id.* ¶¶ 31, 32.[2]

Becker argues "Plaintiff does not allege that Meta or Google understand that 'Conflict Resolution' is the title …. Revealing what *page* was visited is not enough." MTD at 16. Becker is wrong because Meta and Google obtain the **specific URL** of the web page containing a particular video, which demonstrates that a user "requested or obtained" the video content therein as required by the VPPA, 18 U.S.C. § 2710(a). *Compare* FAC ¶¶ 19, 31, *with Adams v. America's Test Kitchen, LP*, 680 F. Supp. 3d 31, 42 (D. Mass. 2023) ("[A] simple visit to the URL would provide any third party who receives the information confirmation of the specific video requested or obtained. … [T]he information disclosed enables third parties to 'connect[ ] a certain user to certain videos.'") (citing *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015)); *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 798 (N.D. Cal. 2019) (finding it "reasonable to infer, … that when a user receives a video[,] … he watches the video"); *Golden*, 688 F. Supp. 3d 150, 160 ("[T]he FAC also adequately alleges that Today.com disclosed 'specific video materials'—to wit, each video's URL and name."). As the Ninth Circuit has explained, the act of clicking on a link is a request to obtain the content contained in the link's URL. *See In re Zynga Priv. Litig.*, 750 F.3d 1098, 1101 (9th Cir. 2014) ("when users enter URL addresses into their web browser using the 'http' web address format, or click on hyperlinks, they are actually telling their web browsers (the client) which resources to request.") (citation omitted).

In any event, Becker's disclosure of users' "video interactions" to Meta—such as "'Play[,]' 'Play course[,]' and 'Resume[,]' showing that a user clicked on buttons to play and resume the

---

[2] Becker argues Plaintiff "offers no explanation for why the alleged disclosure to Meta was different than" that to Google. MTD at 15. But the FAC states "[t]he[] disclosures were effectuated through the third parties' respective trackers[,]" which differ—"the Meta Pixel, as [opposed to] Google Analytics, Google Conversion Linker, Google Signals, and Google's tags/libraries associated therewith." FAC ¶ 18. The trackers involve different code. *Id.* ¶ 18 n.18-22.

video"—leave no doubt that videos are being watched. FAC ¶¶ 31, 32. Thus, Becker disclosed information that is "reasonably and foreseeably likely" to disclose which specific videos were watched by consumers. *Yershov*, 820 F.3d at 486. Becker's related arguments, that it is "highly implausible" that "an ordinary person could decipher the title of the video from the code[,]" and that "Plaintiff does not allege how one would connect the title with the video on the Website[,]" MTD at 15, 16 n.3, ignore the relevant inquiry set by the First Circuit in *Yershov*, where "personally identifiable information" constitutes data "**reasonably and foreseeably likely to reveal**" someone's identity and the video they watched. 820 F.3d at 486 (emphasis added). "The [FAC] therefore adequately alleges that [Becker] disclosed information reasonably and foreseeably likely to reveal which … videos [Plaintiff] has obtained." *Id.*[3]

In any event, an ordinary person can determine what video was watched because Becker discloses to Google and Meta "the title **and URL** of the video." FAC ¶¶ 19-20, 31-32 (emphasis added). An ordinary person could easily open a web browser, paste the URL, and simply look at the webpage to "connect the title with the video on the Website." MTD at 15. Thus, the information Becker provides to Google and Meta "readily permits an ordinary person to identify a particular individual as having watched certain videos." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) (cleaned up); *see also Stark v. Patreon, Inc.*, 635 F. Supp. 3d 841, 853 (N.D. Cal. 2022) ("Plaintiffs have alleged that anyone who possesses an FID may use this number to quickly and easily locate, access, and view the corresponding Facebook profile, which in turn can reveal a user's name or other personal information.") (cleaned up).

### B. Plaintiff's Personally Identifiable Information Was Disclosed

Becker argues that "Plaintiff has not alleged that Google or Facebook received information

---

[3] And Plaintiff alleged that Becker disclosed the video subject matter. *Supra* Argument § II.A.1.

that would likely or foreseeably identify *him*." MTD at 16. Not so. To determine whether PII is disclosed, the First Circuit asks whether the information is "reasonably and foreseeably" likely to reveal a consumer. *Yershov*, 820 F.3d at 486. In other words, if a third party to whom the data is disclosed has the *capability* to use the data to identify a person, that is considered PII. *See id; see also Joseph v. IGN Ent., Inc.*, 2025 WL 2597913, at *3 (D. Mass. July 10, 2025).[4]

As to Meta, Becker claims that Plaintiff does not allege "the hashed phone parameter and specific video title were sent together … in a way that would identify a person as having obtained specific video materials[]"; that (2) Plaintiff "does not specify that hashed phone numbers specifically are part of any hashed information Meta has on hand associated with an individual[]"; and (3) there are no "allegations that Meta actually decodes the hashed phone number and identifies it with individuals." MTD at 19. Becker is wrong on each point. As shown respectively by the blue highlights and yellow highlights in FAC ¶ 31, "Defendant discloses to Meta: [] the user's hashed phone number" **and** "the title and URL of the video the user is watching, along with video interactions[]" **in the same transmission**. *See also id.* ¶¶ 32, 35. Thus, hashed phone numbers and video viewing information *are* sent to Meta, *together*. As to the data Meta has on hand, the FAC makes clear that "Meta, itself, informs advertisers that it can 'use[] ... hashed information and compare[] it to our own hashed information to build custom audiences or more accurately determine which people took action in response to your ad.'" *Id.* ¶ 37. Allegations that Meta "decodes" hashed phone numbers are thus unnecessary because, even in hashed form, phone

[4] Becker is also liable under the "ordinary person" standard, which is not applicable in this Circuit, and finds that data is PII where it "would readily permit an ordinary person to identify a specific individual's video-watching behavior," without regard to the capabilities of the third party to whom the data is disclosed. *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 267 (3d Cir. 2016). This includes information that is "sufficiently identifying without more." *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 182 (S.D.N.Y. 2015).

numbers are *per se* identifying as they can be "'compare[d]'" and "trace[d] to individuals." *Id.* Finally, external information is accessible that can link hashed phone numbers to information that is *per se* identifying—namely, plaintext phone numbers. *Id.* ¶ 36. The FAC notes that while "[h]ashing is … *supposed* to be one-way, meaning [] you can't turn the gibberish back into the [original form]," this notion is "[w]rong[.]'" *Id.* ¶ 37 n.54 (emphasis added); *see also id.* n. 54 (FTC article finding it "wrong" to "assum[e]" that hashing is "sufficient to anonymize data").

Becker argues that the "browser ID" disclosed "simply identifies a browser, not a person" and "[n]o allegations clarify how this information is 'matched[]'" to PII. MTD at 18-19. These points fail. Plaintiff alleges the browser ID value identifies individuals because it is "ultimately 'matched to Meta accounts.'" FAC ¶ 34. Courts have made clear that information identifying Meta accounts is PII. *See Ambrose*, 2022 WL 4329373, at *2 (holding in analogous circumstances that "Ambrose's VPPA claim plausibly states a claim for relief"); *Eichenberger*, 876 F.3d at 986 ("A Facebook link or an email address may very well readily enable an 'ordinary person' to identify an individual."); *Stark*, 635 F. Supp. 3d at 853 (N.D. Cal. Oct. 13, 2022). The FAC clarifies how account matching transpires and **cites Meta's own article** on the point. FAC ¶ 34 n.48. No more is required. *Czarnionka v. Epoch Time Assoc., Inc.*, 2022 WL 17069810, at *4 (S.D.N.Y. Nov. 17, 2022) ("Knowledge of what Facebook *might* do with the disclosed information to yield PII is [] unnecessary.") (emphasis added).

As to Google, Becker attempts to bury its point regarding the Google Signals technology in a solitary sentence; specifically, Becker contends the FAC's "allegation that 'Google Signals was enabled' is not a factual allegation of a person-level identification by Google." MTD at 16. Surely, however, Becker does not know more about Google Signals than *Google itself*. The FAC cites Google articles in order to allege that "Defendant discloses to Google: (i) Google Signals,

which '**associates [data] with user[s'] … Google accounts**[,]'" FAC ¶ 19 (emphasis added); 19 n.23; *see also id.* ¶ 18 n.21-22, ¶ 22 n.30; ¶¶ 49-52. These materials make clear:

- "When Google signals data is available, Analytics associates event data it collects from users with the Google accounts of users who are signed in." (*id.* ¶ 18 n.21) (cleaned up);

- "This association of data with these signed-in users is used to enable cross-device remarketing, and cross-device key events export to Google Ads. Thus, with Google Signals, Google is able to develop a holistic view of how those users interact with an online property from multiple browsers and multiple devices." *Id.* ¶ 49 (cleaned up); and

- Regarding how "Google signals enables[ r]emarketing[:] …[R]emarketing lets [Google's clients] re-engage users based on their behavior in [an] app or on [a] site." *Id.* ¶ 50 (cleaned up).

Thus, Google Signals *does* constitute "person-level identification by Google." MTD at 16. When Becker makes such a disclosure to Google, it knows that Google has the capability to link the Google Signals data to a certain person by name, email, phone number, and more, through the person's associated Google account. Google can do this so precisely that it can identify individual users *across their devices* and target marketing to individual users accordingly.

Becker argues that an additional Google identifier, called the "AUID," is "not an identifier that points to a person." MTD at 17. But Plaintiff alleges that the "AUID" is "a unique identifier for a user used in connection with advertising." FAC ¶ 72 (cleaned up); *see also id.* ¶ 21. And "[u]sing the [AUID] … information, Google can internally retrieve and match the User-provided data [] that was sent earlier." *Id.* ¶ 21 (cleaned up). The LinkedIn article hyperlinked in FAC ¶ 21 n.29 specifies that AUID and user-provided data are "sen[t] … to Google servers to perform a join" and "[u]ser-provided data" includes "PII such as email, phone, address." The fact that AUID is sent to "Google servers to perform a join" with other PII at Google's disposal (here there is other "PII such as" Google Signals and Google cookies) shows Google has the capability to use the

AUID to identify a person—thus, the AUID is PII. *See Yershov*, 820 F.3d at 486; *Joseph*, 2025 WL 2597913, at *3.

Becker argues "the types of cookies Plaintiff alleges are disclosed are not enough for Google to identify an individual user[,]" as "[t]he _ga cookie … allows Google to distinguish one visitor from another, but that does not mean that it allows Google to identify a specific person." MTD at 17 (cleaned up).[5] First, Plaintiff alleges that the "_ga … cookie[ is] used to **identify users**." FAC ¶ 24 (cleaned up); *see also id.* ¶¶ 19, 23. Second, the FAC does not solely concern the _ga cookie. "[T]he Google tracking technologies … compel that user's browser to transmit **several** Google cookies[.]" *Id.* ¶ 23 (emphasis added); *see also id.* ¶¶ 24-30 (listing other cookies and their functions). Becker does not raise and therefore waives any argument as to the other cookies. *See United States v. Gordon*, 954 F.3d 315, 323 (1st Cir. 2020).[6]

The data at issue here identify a person and thus are PII.

**CONCLUSION**

For the foregoing reasons, Defendant's Motion should be denied in full. To the extent that any portion of Defendant's Motion is granted, Plaintiff respectfully requests leave to amend.

Dated: December 17, 2025

Respectfully submitted,

By: /s/ Yitzchak Kopel
Yitzchak Kopel

[5] Relatedly, Becker argues "Plaintiff pleads the existence of Google tools and cookies (most of which he alleges only fire when a user is logged into Google and also has Ads Personalization turned on)." MTD at 16. To the extent this assertion is correct, it raises a class certification issue that may narrow the class, not a merits issue properly resolved on a motion to dismiss.

[6] Becker argues Plaintiff did not allege it disclosed "other types of information that would identify [Plaintiff]" such as "geolocation information[.]" MTD at 18. But geolocation is not the only type of PII as "the term '[PII]' includes [any] information which identifies a person as having requested or obtained specific video materials or services." 18 U.S.C. § 2710(a)(3). "This makes sense. Many types of information other than a name can [] identify a person." *Yershov*, 820 F.3d at 486. *See also* S. Rep. 100-599, at 12 (1988).

**BURSOR & FISHER, P.A.**
Yitzchak Kopel (BBO #716245)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com

*Attorney for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 17, 2025, I electronically filed the foregoing document with the Court's CM/ECF system, which will provide e-mail notice to all counsel of record.

By: */s/ Yitzchak Kopel*
Yitzchak Kopel