## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MICHAEL GARCIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:25-cv-12157-JEK |
| | ) | |
| BECKER PROFESSIONAL | ) | |
| DEVELOPMENT CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### MEMORANDUM AND ORDER ON DEFENDANT'S
### MOTION TO DISMISS THE AMENDED COMPLAINT

**KOBICK, J.**

Plaintiff Michael Garcia brings this putative class action lawsuit against defendant Becker Professional Development Corporation for allegedly violating the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710. Garcia claims that Becker knowingly disclosed his personally identifiable information, including a record of every video that he viewed on its website, to third parties without his consent. Pending before the Court is Becker's motion to dismiss the amended complaint for lack of personal jurisdiction or for failure to state a claim. For the reasons that follow, the motion will be denied. The Court has specific jurisdiction over Becker because it has purposefully availed itself of the Commonwealth's market by generating substantial revenue from Massachusetts consumers; Garcia's claim arises out of, or relates to, Becker's contacts with Massachusetts; and the exercise of jurisdiction over Becker is fair and reasonable. Garcia also plausibly alleges a claim under the VPPA.

**BACKGROUND**

The following facts are recounted as alleged in the amended complaint, supplemented with the jurisdictional evidence submitted in connection with the motion to dismiss. *See Keane v. Expeditors Int'l of Washington, Inc.*, 138 F.4th 613, 615 (1st Cir. 2025).

Becker is a Delaware corporation that has a principal place of business in Missouri. ECF 15, ¶ 75; ECF 20, ¶ 3. It does not have an office in Massachusetts, but four of its employees reside in the Commonwealth. ECF 20, ¶¶ 5, 7. In 2024, Becker generated 2.1% of its overall revenue from Massachusetts. *Id.* ¶ 8. Between 2023 and August 2025, 1,988 users in the Commonwealth purchased Becker's course materials. *Id.* ¶ 9.

Becker operates a website, becker.com, that provides paying subscribers with training materials, including prerecorded videos, for exams such as the Certified Public Accountant ("CPA") exam and for other forms of Continuing Professional Education ("CPE"). *Id.* ¶ 3; ECF 15, ¶¶ 4-5, 11, 75. Subscribers pay between $329 and $5,349 to access Becker's videos. ECF 15, ¶ 11 & n.7. For "commercial gain" and to improve its advertising, marketing, and analytics, Becker knowingly discloses its website users' personally identifiable information ("PII") to Google LLC and Meta Platforms, Inc. without their consent so that those entities can help Becker "launch marketing campaigns, target specific users with advertising, and analyze Website user data." *Id.* ¶¶ 6, 16-17, 38, 61-65, 86, 101.

By integrating Google and Meta's respective trackers on its website, Becker transmits to those entities the title and URL of every video that its users view. *Id.* ¶¶ 6, 17-20, 31-32, 64. Becker also discloses information to both entities that is sufficient to identify those users. *Id.* ¶ 16. When users watch Becker's videos online, for example, it transmits to Google their Google Signals data. *Id.* ¶¶ 17, 22. Google can, in turn, associate that data with users' Google accounts if those users

are signed into Google and have personalized advertisements turned on. *Id.* ¶¶ 19 & n.23, 49. Becker similarly provides such users' phone numbers to Meta in a manner that, while anonymized or "hashed," remains "traceable" to the user. *Id.* ¶¶ 17, 31, 35-37. Meta can match a given hashed number to its repository of hashed phone numbers and, as the Federal Trade Commission has generally warned, hashed numbers can be utilized to identify users. *Id.* ¶ 37 & n.55.

Garcia is a Massachusetts resident who subscribed to Becker's CPA exam review program in January 2024. *Id.* ¶¶ 66, 69, 74. To complete the subscription, he provided his phone number, which is the same number that he uses for his Facebook account. *Id.* ¶¶ 12, 68. Since then, he has watched numerous videos on Becker's website while he was signed into his Google account. *Id.* ¶¶ 66-67. Every time he viewed a video, Becker disclosed to Google his Google Signals data, the URL, and the video title. *Id.* ¶ 72. Google could then associate that data with Garcia's Google account because he was signed into that account and had personalized advertisements turned on. *Id.* ¶¶ 67, 72. Likewise, Becker transmitted to Meta his hashed phone number, the video title, and the URL. *Id.* ¶ 72. Based on this information, "Google and Meta were able to identify [him] and attribute his video viewing records to an individualized profile" of him. *Id.* ¶ 73. Garcia did not consent to Becker disclosing such PII and video-viewing information to Meta or Google. *Id.* ¶ 70.

Garcia initiated this putative class action lawsuit in July 2025. ECF 1. The amended complaint, filed in October 2025, asserts a violation of the VPPA, 18 U.S.C. § 2710. ECF 15, ¶¶ 95-103. Garcia seeks to represent a class of "all persons in the United States who created a Becker account, used the Website to watch a pre-recorded video, and subsequently had their PII disclosed to third parties." *Id.* ¶ 88. Becker moved to dismiss the amended complaint for lack of personal jurisdiction or for failure to state a claim under Federal Rules of Civil Procedure 12(b)(2)

and 12(b)(6). ECF 19. After Garcia opposed that motion and Becker filed its reply, the Court held a hearing and took the motion under advisement. ECF 24, 28, 45.

<b>DISCUSSION</b>

**I.      Personal Jurisdiction.**

Becker first moves to dismiss the amended complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). In considering such a motion, the Court may use one of three methods to assess whether Garcia has met his burden to establish personal jurisdiction: the prima facie method, the preponderance method, or the likelihood method. *See A Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 58 & n.5 (1st Cir. 2016). The prima facie method is "most commonly employed in the early stages of litigation." *Rodriguez v. Fullerton Tires Corp.*, 115 F.3d 81, 83-84 (1st Cir. 1997). Under that approach, the Court asks whether Garcia has proffered "evidence which, taken at face value, suffices to show all facts essential to personal jurisdiction." *Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 (1st Cir. 2016). Garcia cannot simply "rely on unsupported allegations in [his] pleadings." *A Corp.*, 812 F.3d at 58 (quotation marks omitted). He must instead "go beyond the pleadings and make affirmative proof." *Rosenthal v. Bloomingdales.com, LLC*, 101 F.4th 90, 94 (1st Cir. 2024) (quotation marks omitted). The Court will give "credence to [Garcia's] version of genuinely contested facts," *Baskin-Robbins*, 825 F.3d at 34, and will consider Becker's proffered facts "only to the extent that they are uncontradicted," *Adelson v. Hananel*, 510 F.3d 43, 48 (1st Cir. 2007).

Garcia invokes both federal question and diversity jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332(d), respectively. *See* ECF 15, ¶¶ 76-77. Pursuant to Federal Rule of Civil Procedure 4(k)(1)(A), which the parties agree applies here, the Court's role is essentially the same under either statute: to determine whether the exercise of personal jurisdiction over Becker meets

4

the requirements of the Massachusetts long-arm statute, M.G.L. c. 223A, § 3, and the Due Process

Clauses of the Constitution. *See Baskin-Robbins*, 825 F.3d at 34 & n.2 (citing Fed. R. Civ. P.

4(k)(1)(A)). Because the long-arm statute is not coterminous with due process limits on personal

jurisdiction, Becker's conduct must satisfy both the statute and the strictures of due process. *See*

*Ward v. AlphaCore Pharma, LLC*, 89 F.4th 203, 209 (1st Cir. 2023); *SCVNGR, Inc. v. Punchh,*

*Inc.*, 478 Mass. 324, 330 n.9 (2017).

A.    The Massachusetts Long-Arm Statute.

The Massachusetts long-arm statute authorizes a court to exercise personal jurisdiction

over a defendant who, as relevant here, acts "as to a cause of action in law or equity arising from

the [defendant's] (a) transacting any business in this commonwealth; (b) contracting to supply

services or things in this commonwealth; . . . [or] (d) causing tortious injury in this commonwealth

by an act or omission outside this commonwealth if he regularly does or solicits business, or

engages in any other persistent course of conduct, or derives substantial revenue from goods used

or consumed or services rendered, in this commonwealth." M.G.L. c. 223A, § 3. Garcia contends

that subsections (a), (b), and (d) apply. Agreeing that subsection (d) is applicable, the Court does

not consider subsections (a) or (b).

Section 3(d) is construed broadly in favor of asserting personal jurisdiction. *See Noonan v.*

*Winston Co.*, 135 F.3d 85, 92 (1st Cir. 1998). While "predicated on general jurisdiction," Section

3(d) may be applied to general or specific jurisdiction. *Fletcher Fixed Income Alpha Fund, Ltd. v.*

*Grant Thornton LLP*, 89 Mass. App. Ct. 718, 724 (2016) (quotation marks omitted); *accord Barnes*

*v. Merck & Co.*, 648 F. Supp. 3d 283, 289 (D. Mass. 2023); *see Ford Motor Co. v. Montana Eighth*

*Jud. Dist. Ct.*, 592 U.S. 351, 358-59 (2021) (distinguishing general and specific jurisdiction). To

satisfy this Section, Garcia must demonstrate that he suffered "tortious injury in Massachusetts

5

caused by an out-of-State act or omission" by Becker and that Becker "regularly does or solicits business in Massachusetts or otherwise engages in a persistent course of conduct or derives substantial revenue from Massachusetts." *Fletcher Fixed Income Alpha Fund*, 89 Mass. App. Ct. at 724. Such business, conduct, or revenue need not be tied to Garcia's alleged injury. *See SCVNGR, Inc. v. Punchh, Inc.*, 478 Mass. 324, 329-30 & n.10 (2017). But the mere fact that Becker's website "had the potential of 'reach[ing] potential clients in Massachusetts'" will not satisfy Section 3(d) if Garcia cannot show that the website "did anything beyond providing information." *Roberts v. Legendary Marine Sales*, 447 Mass. 860, 865 (2006). Garcia must, instead, establish that Becker "purposefully attempted to conduct business or solicit business *in Massachusetts* either by means of the [website] or otherwise," that it engages in a "'persistent course of conduct' . . . in Massachusetts," or that it "'derives substantial revenue' from transactions in Massachusetts." *Id.* (quoting M.G.L. c. 223A, § 3(d)).

Garcia has proffered sufficient evidence to bring Becker within the scope of Section 3(d) of the long-arm statute. At this stage, it is accepted as true and thus undisputed that Becker injured Garcia by intentionally disclosing his PII to unrelated third parties. ECF 15, ¶¶ 6-7, 61, 72. Becker's Vice President of Product Development, Angeline Brown, also attests that in 2024, 2.1% of its overall revenue came from Massachusetts and 734 users in the Commonwealth purchased its course materials. ECF 20, ¶¶ 8-9. While Brown does not provide Becker's total revenue for 2024, Garcia alleges in the amended complaint that subscribers like himself pay between $329 and $5,349 to access Becker's videos. ECF 15, ¶¶ 11 & n.7, 66. Given its hundreds of users in Massachusetts, Becker has therefore generated hundreds of thousands of dollars from the Commonwealth in 2024 alone. This evidence demonstrates, at a minimum, that Becker "derives substantial revenue" from its business in Massachusetts. M.G.L. c. 223A, § 3(d); *see Heins v.*

*Wilhelm Loh Wetzlar Optical Mach. GmbH & Co. KG.*, 26 Mass. App. Ct. 14, 20-21 (1988) (Section 3(d) met based on sale of $56,000 machine and presence of other similar machines in Massachusetts); *Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 219 (1st Cir. 1989) (same for "sale of 6000 pairs of shoes for $15,000"); *Rancourt v. Meredith Corp.*, No. 22-cv-10696-ADB, 2024 WL 381344, at *5-6 (D. Mass. Feb. 1, 2024) (same given defendant's "nearly $70,000 in ad revenue from devices located in Massachusetts over two years").

      B.      Due Process Requirements.

Having plausibly established jurisdiction under Massachusetts' long-arm statute, Garcia must also demonstrate that the exercise of personal jurisdiction over Becker comports with due process. "Due process dictates that a court may only assert its power over an out-of-forum defendant if the party has 'such contacts with the forum [State] that the maintenance of the suit is reasonable, in the context of our federal system of government, and does not offend traditional notions of fair play and substantial justice.'" *Sec. & Exch. Comm'n v. Gastauer*, 93 F.4th 1, 8 (1st Cir. 2024) (quoting *Ford Motor*, 592 U.S. at 358). The due process inquiry "has long focused on the nature and extent of the defendant's relationship to the forum State." *Ford Motor*, 592 U.S. at 358 (quotation marks omitted). In this specific personal jurisdiction case, the exercise of jurisdiction over Becker satisfies due process if Garcia can "show that (1) [his] claim directly arises out of or relates to [Becker's] forum activities; (2) [Becker's] forum contacts represent a purposeful availment of the privilege of conducting activities in that forum, thus invoking the benefits and protections of the forum's laws and rendering [Becker's] involuntary presence in the forum's courts foreseeable; and (3) the exercise of jurisdiction is reasonable." *Plixer Int'l, Inc. v. Scrutinizer GmbH*, 905 F.3d 1, 7 (1st Cir. 2018). "This test is flexible and fact-specific, written more in shades of grey than in black and white." *Rosenthal*, 101 F.4th at 95 (quotation marks omitted).

    *1. Purposeful Availment.*

  Since "the 'purposeful availment' element often proves dispositive" in "website cases," the Court begins with this element and concludes that Garcia has established that Becker purposefully availed itself of the Massachusetts market. *Motus, LLC v. CarData Consultants, Inc.*, 23 F.4th 115, 124 (1st Cir. 2022). To meet this requirement, Garcia must identify "some act by which [Becker] purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Rosenthal*, 101 F.4th at 96 (quotation marks omitted). The inquiry focuses on the voluntariness of Becker's actions—that is, whether Becker's contacts with Massachusetts resulted from its own actions—and the foreseeability that its connection with Massachusetts might cause it to be haled into the Commonwealth's courts. *See id.* Because a website is involved, Garcia must "sho[w] that the website either specifically targets the forum or has resulted in [Becker's] knowing receipt of substantial revenue from forum residents." *Kuan Chen v. United States Sports Acad., Inc.*, 956 F.3d 45, 60 (1st Cir. 2020).

  Garcia alleges that Becker "conducts substantial business" in Massachusetts, where it ships textbooks and sells subscriptions. ECF 15, ¶¶ 78-79. Garcia also alleges that Becker intentionally transmits the PII of consumers, including those in Massachusetts, to Google and Meta "for its own commercial gain"—namely, so that those entities can help it "launch marketing campaigns, target specific users with advertising, and analyze Website user data." *Id.* ¶¶ 38, 62, 64, 86. Becker's Vice President of Product Development, Angeline Brown, provided a declaration that bolsters these allegations. She avers that 2.1% of Becker's total revenue in 2024 came from Massachusetts and that, between 2023 and August 2025, 1,988 of its users had an address in the Commonwealth and purchased its course materials. ECF 20, ¶¶ 8-9. Based on the addresses provided by its users, Becker knows that it has generated significant revenue—likely hundreds of thousands of dollars,

if not more, over the past two years—from Massachusetts residents. *See id.*; ECF 15, ¶¶ 11 & n.7, 78-79. While Becker's sales may not have focused specifically on Massachusetts, this Court will not "discount [Becker's] Massachusetts sales because those sales were part of a nationwide sales effort." *Knox v. MetalForming, Inc.*, 914 F.3d 685, 692 (1st Cir. 2019); *see* ECF 20, ¶¶ 4, 10-23.

Becker's "voluntary service of the [Massachusetts] market and its not insubstantial income from that market show that it could have 'reasonably anticipated' being haled into [this] court." *Plixer*, 905 F.3d at 10 (earning "nearly $200,000 in business over three-and-a-half years" from 156 forum customers); *see Stokinger v. Armslist, LLC*, 166 F.4th 229, 239 (1st Cir. 2026) (finding purposeful availment because defendant had "an average of '16,000 listings per year for firearms for sale in [the forum state]'" on its website and due to "the website's design and generation of advertising revenue"); *Rancourt*, 2024 WL 381344, at *8-10 (same where defendant "earned over $66,000 or 2% of the App's total U.S. ad revenue from Massachusetts devices" and "had nearly 55,000 Massachusetts users"); *Power v. Connectweb Techs., Inc.*, 648 F. Supp. 3d 302, 318-19 (D. Mass. 2023) (same where defendant "'sold products to at least 7,400 customers in Massachusetts totaling more than $345,000.00 in sales'" (citation omitted)). Reflecting its "intent to serve the forum," Becker "knew that it was serving [Massachusetts] customers and took no steps to limit its website's reach or block its use by [those] customers." *Plixer*, 905 F.3d at 8-9. At this early stage, Garcia has therefore adequately demonstrated that Becker has purposefully availed itself of the Massachusetts market.

  2. *Relatedness.*

Garcia has likewise established that his VPPA claim arises out of, or relates to, Becker's activities in Massachusetts. To demonstrate relatedness for this claim, Garcia "must show a nexus between his claim and [Becker's] forum-based activities." *Cappello v. Rest. Depot, LLC*, 89 F.4th

238, 245 (1st Cir. 2023) (quotation marks omitted). Garcia alleges that Becker violated the VPPA by intentionally disclosing his PII to Meta and Google without his consent. ECF 15, ¶¶ 16, 70, 73. In her declaration, Brown responds that Becker neither "tailor[s] content or its advertisements specifically to Massachusetts users" nor runs "Massachusetts-exclusive geofenced or geo-targeted campaigns." ECF 20, ¶¶ 22-23. She further attests that Garcia's account "had no connection to Massachusetts-specific advertising" and that he instead received "uniform national content and marketing materials." *Id.* ¶ 24. But she concedes that Becker knew, based on shipping and billing addresses, that Garcia and other users were residents of Massachusetts. *Id.* ¶¶ 8-9; *see* ECF 15, ¶ 78. Becker also does not presently contest that after Garcia and other Massachusetts residents purchased a subscription, it transmitted their PII and video-viewing information to Google and Meta "for its own commercial gain" so that those entities could help it "launch marketing campaigns, target specific users with advertising, and analyze Website user data." ECF 15, ¶¶ 38, 74, 86.

Based on these allegations, Becker "knew that it was serving [Massachusetts] customers" like Garcia while profiting from their subscriptions and the sale of their PII. *Plixer*, 905 F.3d at 9; *see Briskin v. Shopify, Inc.*, 135 F.4th 739, 760 (9th Cir. 2025) (en banc) (finding relatedness because defendant's "installation of software onto unsuspecting Californians' devices and extracting personal data from them is the kind of contact that would tend to cause privacy injuries"); *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 355 (4th Cir. 2020) (same where defendant "directly profited from a substantial audience of Virginia visitors" by "collect[ing] personal data as they visited [his] Websites" and selling that "data and advertising spaces on the Websites"). The disclosure of that data, which Becker knowingly received from paying Massachusetts subscribers, forms the basis for Garcia's privacy-based claim under the VPPA. *See*

*Rancourt*, 2024 WL 381344, at \*10 (finding relatedness for a VPPA claim where defendant's "use of advertising and content curation that target[ed] individual Massachusetts residents . . . increase[d] user engagement with the App"); *Rodriguez v. Delta T LLC*, No. 23-cv-3717-HDV-AGR, 2023 WL 9419152, at \*3 (C.D. Cal. Dec. 12, 2023) (same where defendant allegedly knowingly disclosed the video and PII of users of its website to Google "'to build audiences on Google and retarget them for its advertising campaigns'" (citation omitted)).

### 3. Reasonableness.

The final element is whether the exercise of jurisdiction over Becker would be fair and reasonable. That inquiry requires consideration of the following factors: "(1) the defendant's burden of appearing [in the forum state], (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies." *Baskin-Robbins*, 825 F.3d at 40 (quotation marks omitted). Courts employ a "sliding scale" approach, with the importance of this multi-factor reasonableness inquiry varying with the strength of the plaintiff's showing on the relatedness and purposeful availment inquiries. *Id.* Applying these factors serves "to aid the court in achieving substantial justice." *Nowak v. Tak How Invs., Ltd.*, 94 F.3d 708, 717 (1st Cir. 1996).

The factors favor the exercise of jurisdiction. First, the fact that Becker is based in Missouri and has no offices in Massachusetts does not mean that it would be burdened by litigating in the Commonwealth. ECF 20, ¶¶ 3, 5. Because "it is 'almost always inconvenient and costly for a party to litigate in a foreign jurisdiction,'" the First Circuit has recognized that "a defendant 'must demonstrate that exercise of jurisdiction in the present circumstances is onerous in a special, unusual, or other constitutionally significant way.'" *Rodríguez-Rivera v. Allscripts Healthcare*

11

*Sols., Inc.*, 43 F.4th 150, 166 (1st Cir. 2022) (quoting *Nowak*, 94 F.3d at 718). Becker has not made that showing or specified any unique burden associated with appearing in Massachusetts. *See Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir. 1994) (modern travel "creates no especially ponderous burden for business travelers"). Second, as Becker concedes, Massachusetts "has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985) (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)); *see* ECF 21, at 13. Third, some deference is owed to the plaintiffs' choice of forum, *see Baskin-Robbins*, 825 F.3d at 41, and it would be most convenient for Garcia to litigate this matter in Massachusetts, where he resides. Neither party addresses the remaining two factors. Assuming those factors weigh in favor of neither party, subjecting Becker to litigation in this forum comports with traditional notions of fair play and substantial justice. Accordingly, the exercise of jurisdiction over Becker would not offend due process.

## II.     Sufficiency of the VPPA Claim.

Becker alternatively moves to dismiss the amended complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). In evaluating such a motion, the Court must determine "whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintif[f], the complaint states a claim for which relief can be granted." *Cortés-Ramos v. Martin-Morales*, 956 F.3d 36, 41 (1st Cir. 2020) (quotation marks omitted). The complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679.

In Becker's telling, Garcia fails to plausibly allege a claim under the VPPA. Congress enacted the VPPA in 1988 to "'preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials.'" *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 485 (1st Cir. 2016) (quoting S. Rep. No. 100-599, at 1 (1988)). The statute provides that a "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person." 18 U.S.C. § 2710(b)(1). At issue here is whether Garcia has alleged that Becker disclosed his "personally identifiable information." *Id.* The VPPA defines that term to "includ[e] information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *Id.* § 2710(a)(3). The First Circuit has held that this term encompasses "information reasonably and foreseeably likely to reveal which . . . videos [a person] has obtained." *Yershov*, 820 F.3d at 486. While "PII is not limited to information that explicitly names a person," that Court elaborated, "there is certainly a point at which the linkage of information to identity becomes too uncertain, or too dependent on too much yet-to-be done, or unforeseeable detective work." *Id.*

Becker argues that Garcia does not allege that it disclosed the title of any specific video. But the amended complaint does allege that Becker has disclosed to Google and Meta the title and URL of videos watched by Garcia and other users. ECF 15, ¶¶ 19, 31, 98. For example, Becker has disclosed to those entities the title of a video, "Conflict Resolution," through lines of code, and the category and subject matter of the video, "CPE Learning," through the URL,

https://cpelearning.becker.com/media/85499641/watch. *Id.* ¶¶ 4-5, 19-20, 31-32.[1] These factual allegations are sufficient to state a claim that Becker violated the VPPA by disclosing a video's title or, at a minimum, its subject matter. *See Rancourt*, 2024 WL 381344, at *15 (plaintiff "plausibly alleged disclosure of 'specific video materials'" because "the title and content of a video on the App [could] be obtained simply by conducting a Google search of the video ID"); *Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 160 (S.D.N.Y. 2023) ("a complaint need not allege the disclosure of specific video titles").

Becker further contends that Garcia has not alleged that it disclosed information that would identify him. This contention, too, is belied by factual allegations in the amended complaint. As pled, Becker discloses Google Signals data to Google, which can associate that data with users' Google accounts if those users are signed in and have personalized advertisements turned on. ECF 15, ¶¶ 19 & n.23, 49. Because Garcia was logged into his Google account and had personalized advertisements turned on when he accessed Becker's website, Becker's disclosure of his Google Signals data permitted Google to associate him with his Google account. *Id.* ¶¶ 67, 72. With respect to Meta, Garcia subscribed to Becker's services in January 2024 with the same phone number that he had used to create his Facebook account over a decade ago. *Id.* ¶¶ 66, 68. Becker then provided Meta with Garcia's "hashed" phone number. *Id.* ¶¶ 72, 98. The hashed number is plausibly traceable to Garcia because Meta can use its existing repository of hashed phone numbers to match the number disclosed by Becker to the existing number associated with his Facebook account. *Id.* ¶¶ 37, 68. The Federal Trade Commission has also confirmed that identities can be ascertained from hashed numbers. *Id.* ¶ 37 & n.55. And as the First Circuit has acknowledged, a phone number can be used to identify an individual. *See Yershov*, 820 F.3d at 486; *see also* ECF 15, ¶ 36 & n.21.

---

[1] CPE, as previously described, is an acronym for Continuing Professional Education.

Accordingly, Google and Meta can allegedly use Garcia's Google Signals data and his hashed phone number, respectively, "to identify [him] and attribute his video viewing records to an individualized profile of [him]." ECF 15, ¶ 73. This "linkage of information to identity" does not depend on "unforeseeable detective work." *Yershov*, 820 F.3d at 486.

Garcia need not allege, as Becker asserts, that Meta *actually* identified him as having watched specific training videos. Rather, information is PII if it creates "firm and readily foreseeable" ties to an individual user. *Yershov*, 820 F.3d at 486. These collective allegations support the plausible inference that Becker disclosed PII to Meta and Google because that information could be used to identify Garcia and connect him to the videos that he viewed. *See Joseph v. IGN Ent., Inc.*, No. 24-cv-11579-MJJ, 2025 WL 2597913, at *3 (D. Mass. July 10, 2025) (finding PII was disclosed where defendant transmitted plaintiff's "email address, his user ID, and the titles and URLs of videos viewed" to a third party that "could use the information to associate video-viewing activity with individual users"); *Adams v. Am.'s Test Kitchen, LP*, 680 F. Supp. 3d 31, 40, 43 (D. Mass. 2023) (same where defendants shared users' Facebook ID with Meta); *see also Belozerov v. Gannett Co.*, 646 F. Supp. 3d 310, 314 (D. Mass. 2022) ("A Facebook ID meets the broad definition of PII in this circuit."). Accordingly, Garcia's VPPA claim survives dismissal.

**CONCLUSION AND ORDER**

For the foregoing reasons, Becker's motion to dismiss the amended complaint, ECF 19, is DENIED.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
Dated: July 8, 2026                UNITED STATES DISTRICT JUDGE